In re Clarence C. and Michelle A.
EDWARDS, Debtors.

No. 85 B 10104 (PBA).

United States Bankruptcy Court,
S.D. New York.

July 5, 1985.

Clarence C. and Michelle A. Edwards, pro se.

Budget and Credit Counseling Services, Inc., New York City (James Bickford, New York City, of counsel), for debtors.

Ira S. Greene, New York City, Trustee.

## MEMORANDUM DECISION AND ORDER

PRUDENCE B. ABRAM, Bankruptcy Judge:

Clarence C. and Michelle A. Edwards (the "Debtors") filed a joint petition for relief under Chapter 7 of the Bankruptcy Code ("Code") on January 25, 1985. The matter for determination is the court's *sua sponte* motion under Code § 707(b). The motion was made in the form of an order to show cause dated February 15, 1985, which directed the Debtors to appear and show cause why their Chapter 7 petition should not be dismissed. The order to show cause stated, *inter alia,*

" * * * It appearing that Code § 707(b), as amended, authorizes the bankruptcy court, 'on its own motion and not at the request or suggestion of a party in interest' to dismiss, after notice and a hearing a case filed by an individual whose debts are primarily consumer debts if the court finds that the granting of relief would be a 'substantial abuse' of Chapter 7, and

"It appearing that Code § 101(7) defines 'consumer debt' as a debt incurred by an individual primarily for personal, family, or household purpose, and * * *

"It further appearing that the Debtors have scheduled as their only debts obligations of approximately $10,500 for consumer purchases and obligations of approximately $3,000 on student loans, and

"It further appearing in their schedule of current income and expenditures that the Debtors have an annual gross income of $60,000 and a combined monthly take-home pay of $2,550 and have no dependents, and

"It further appearing that the Debtors' estimated monthly expenditures total $2,366, including $250 for recreation, and

"It further appearing that a budget surplus of $184 per month exists and that the Debtors have otherwise made no showing of why they are unable to make periodic future payments on their debts, it is therefore

"ORDERED that the Debtors * * * show cause before the undersigned * * * why an order should not be entered dismissing their Chapter 7 petition on the grounds that the granting of relief would be a substantial abuse of the provisions of Chapter 7 * * * " Order to Show Cause dated February 14, 1985.

Pursuant to the order to show cause a hearing was held on March 20, 1985. The Debtors appeared at the hearing and submitted two affidavits. No testimony was taken at the hearing. At the hearing's conclusion, the court took the matter under advisement. Based upon the supplemental information provided by the two affidavits and for the reasons which follow, the court has determined that the Debtors' petition is not a substantial abuse of Chapter 7 within the meaning of Code § 707(b) and that the petition should not be dismissed.

Code § 707(b) was added by the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA").[1] It provides as follows:

"(b) After notice and a hearing, the court, on its own motion and not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor."

This section inferentially imposes a duty on the bankruptcy court to review petitions filed under Chapter 7 to determine whether the granting of a discharge would be a

1. Code § 707(b) applies only to cases filed on or after October 8, 1984. See BAFJA § 553.

"substantial abuse of the provisions of this chapter".[2]

■ The phrase substantial abuse is not defined in the Bankruptcy Code. Resort to dictionary definitions is therefore appropriate and helpful. The term "abuse" has been defined as:

"To make excessive or improper use of a thing, or to employ it in a manner contrary to the natural or legal rules for its use; to make an extravagant or excessive use, as to abuse one's authority." Black's Law Dictionary (1968).

The term "substantial" includes among its meanings real, not seeming or imaginary, that of moment or important. See Webster's New International Dictionary (2d Edition).

■ In this court's view, Congress intended the courts to apply Code § 707(b) as a type of motion to dismiss for failure to state a claim for relief. It is to be used to deny Chapter 7 relief to those persons whose pleadings in the form of the petition, schedules, statement of affairs and statement of income and expenses fail to reflect a need for the relief being sought because they do not reflect that the debtor is now suffering or will suffer in the near future from any meaningful economic hardship. The "substantial abuse" provision of Code § 707(b) is in the nature of a threshold predicate to entitlement to Chapter 7 relief.

To date there is apparently only one reported case considering Code § 707(b), *In re Bryant*, 47 B.R. 21 (Bankr.W.D.N.C. 1984). *Cf. In re Wright*, 48 B.R. 172 (Bankr.E.D.N.C.1985) (Attorney denied compensation for failure to appear and assist debtor at substantial abuse hearing). In *Bryant*, the bankruptcy judge dismissed Bryant's Chapter 7 petition upon finding that Bryant had failed to list a number of credit card debts, misstated or misrepresented his expenses and could, with "only a modicum of restraint," 47 B.R. 23, have made payments of at least $800.00 per month under a Chapter 13 plan (totalling

$28,000.00 over 3 years or 67% of his unsecured obligations).

"[T]his case was brought, not because of the Debtor's unemployment or an inability to pay on his part, but because he simply desired to shuck a couple of his debts. His testimony was that he had previously guaranteed a number of business debts and he filed this bankruptcy in order to 'get rid' of the same. * * * " * * * While Congress intended to give Debtors relief in such cases, it was not the design of the Bankruptcy laws to allow the Debtor to lead the life of Riley while his creditors suffer on his behalf. "Therefore, in light of the Debtor's purpose in filing this petition; his fraudulent and misleading omissions in his petition; his attempts to pad his expenses statement in order to misrepresent his financial position; and the relatively exorbitant lifestyle which he seeks to maintain while taking shelter from his creditors under the Bankruptcy provisions, the court concludes that to allow this petition would be a substantial abuse of the provisions of Chapter 7." 47 B.R. at 24, 26.

■ In adopting a bankruptcy law pursuant to the authority granted to it by the United States Constitution, Congress has concluded that no abuse exists when an honest debtor seeks to avail himself of a fresh start without the encumbrance of life-long debt through obtaining a bankruptcy discharge. The matter was well put by the United States Supreme Court in *Local Loan Co. v. Hunt*, 292 U.S. 234, 245, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934): "The power of the individual to earn a living for himself and those dependent upon him is in the nature of a personal liberty quite as much as, if not more than, it is a property right. * * * The new opportunity in life and the clear field for future effort, which it is the purpose of the Bankruptcy Act to afford the emancipated debtor, would be of little value to the wage earner if he were obliged to face the necessity of devoting the whole or a considerable

**2.** The term "substantial abuse" as used hereafter in this opinion is intended as a shorthand reference to this entire phrase.

portion of his earnings for an indefinite time in the future to the payment of indebtedness incurred prior to his bankruptcy."

■■■■■ This court has determined that it is reasonable to conclude that a debtor whose income and reasonable expenses indicate that he could pay over three years an amount equal to 100% of the principal owed to his creditors is not suffering from sufficient economic hardship to warrant use of Chapter 7.[3] That debtor ought to

adopt an ad hoc, free-wheeling approach to sift out debtors the court finds distasteful.

Another form of possible debtor abuse is obviated by Code § 362(b)(1) which excepts criminal proceedings from the scope of the automatic stay. Thus, a bankruptcy filing will not relieve the debtor from the effects of criminal conduct. See, e.g., *In re Hansen*, 48 B.R. 107 (Bankr.W.D. Wash.1985) (Debtor's application for order enjoining further bad check prosecution denied).

More general than these provisions is present Code 707(a), which was the entirety of Code § 707 before the recent addition of subsection (b). This section provides

"(a) The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including

(1) unreasonable delay by the debtor that is prejudicial to creditors * * *."

See 4 Collier on Bankruptcy (15th Ed.1985), ¶ 707.01. See also Code § 305(a) (Court may dismiss a case or suspend all proceedings in the case after notice and a hearing if the interests of creditors and the debtor would be better served by dismissal or suspension.)

It is thus apparent that prior to the adoption of Code § 707(b) the court, creditors and trustee had an arsenal of weapons to deal with the fraudulent or abusive debtor. However, none of these existing remedies were appropriate to deal with the newly perceived abuse of a debtor presently insolvent but whose immediate future income would permit payment of his debts over a reasonable time period.

Indeed, what came to be viewed as a deficiency in the bankruptcy system and resulted in the adoption of Code § 707(b) is precisely one of its long-time and central attributes: the ability of a debtor to free his future income from the claims of creditors. See *Local Loan Co. v. Hunt, supra* in text. The debtor's personal and real property would be exempt from levy pre- or post-bankruptcy to the extent permitted by the federal and state exemption laws. Claiming exemptions, which are permitted by state as well as federal law, cannot be an abuse of Chapter 7 intended to be encompassed with Code § 707(b) since the debtor is statutorily entitled to claim exemptions. Chapter 7 does eliminate a creditor's right to garnish and levy upon a debtor's future income; and Chapter 13 alters those rights by limiting recourse to plan payments and fixing five years as the outside length of the plan.

Interestingly, it is, in fact, a wage garnishment which appears to have precipitated the Debtors in this case to file a Chapter 7 petition. Although there are limits on wage garnishment under both state and federal laws, it is apparent

---

**3.** Both the legislative background to adoption of Code § 707(b) and the creditor protections against bankruptcy abuse long found in other sections of the Bankruptcy Code have caused the court to determine that the debtor's future ability to pay is the proper focus of Code § 707(b). Classic forms of bankruptcy abuse are well known. For example, property may be concealed, books and records may be conveniently lost, or debts sought to be discharged may have been incurred through fraud or embezzlement. Satisfactory safeguards have long existed which, when properly acted on by creditors and other parties in interest, prevent these forms of abuse. Code § 523 specifies types of debts which may not be discharged. Three of the exceptions require creditor action to preserve; if the creditor fails to act promptly these types of debts are discharged. The balance of the exceptions to discharge do not require affirmative creditor action and are automatic. The three requiring creditor action are Code § 523(a)(2) (the fraud or false pretense or false financial statement exception), § 523(a)(4) (the fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny exception) and § 524(a)(6) (the willful and malicious injury to another or another's property exception).

Code § 727 provides a number of grounds on which objection may be made to the debtor's discharge generally. If one of the specified grounds is proven the debtor receives no discharge at all. Most of the grounds relate to conduct in connection with the bankruptcy case itself, such as knowingly and fraudulently making a false oath in connection with the case (Code 727(a)(4)), failing to obey a lawful order (Code 727(a)(6)), destroying, falsifying or failing without justification to keep books and records from which the debtor's financial affairs might be ascertained (Code § 727(a)(3)). A few relate to pre-petition conduct, such as fraudulently conveying property. See Code § 727(a)(2). Either a trustee or a creditor may object to the grant of a discharge.

Code §§ 523 and 727 carefully tailor the remedy to the nature of the perceived abuse. Thus, certain matters are deemed sufficient to warrant denying a debtor a discharge altogether. Yet others are thought to warrant only the denial of the discharge of a particular debt. Code § 707(b) should not be used to dismiss a case when the evidence is not quite strong enough to warrant denying a discharge under the Code § 727 or a way of overcoming a creditor's failure to object to the dischargeability in a timely fashion as required by Code § 523. Code § 707(b) does not give a license to the court to

use either Chapter 13 or forego bankruptcy relief and rely on the protections afforded under the state and federal wage garnishment and other laws.[4]

The court has concluded that it should set this rather high screening standard for a debtor's entitlement to Chapter 7 relief for several reasons. Firstly, even a debtor who can pay 100% of the principal of his debts over three years is not making a 100% payment to his creditors since their claims no doubt include interest at rate that may be as high as 20%. Any payments made under a Chapter 13 plan would be further diminished by the amount of the trustee's fees. Secondly, at the time of initiating any inquiry, the court can only make preliminary estimates that reflect the possibility of such a payment. Further information received will refine the picture, generally by increasing expenses and reducing income. Thus, if a lower threshold inquiry level is set, the court is likely to find itself dismissing most of its inquiries as the debtor's future ability to pay becomes entirely problematic. Futile inquiries are a burden on the court, an imposition on the debtor and his counsel, and unlikely to encourage greater respect for the bankruptcy system by creditors, or debtors. Thirdly, the presumption in favor of granting the relief sought by the debtor which Congress incorporated into Code § 707(b) means that, although the court should examine all the facts, including the reasons why the debtor has chosen to file, the court should accord great weight to the debtor's own assessment of his financial condition. Fourthly, and perhaps as significantly, the so-called Purdue Study used by the consumer credit industry in lobbying Congress for bankruptcy reform concluded that 30% of all Chapter 7 debtors could have repaid their debts in full over 3 years.[5] This standard should thus cause inquiry to be made into a substantial number of Chapter 7 filings. The 100% of principal standard would be easy to apply and easily understood.[6]

The consumer credit industry would have liked Congress to make use of Chapter 13 compulsory.[7] The case against a compulso-

that those limits exceed the amount some debtors can live with. Code § 707(b) is reflective of a change in viewpoint brought about by the rapid expansion of consumer credit since World War II predicated on future income. Code § 707(b) is an attempt to adjust the balance between the ease of discharge and respect for the sanctity of contract to accommodate the relatively recent economic phenomena of consumer credit and the increased willingness of debtors to utilize bankruptcy and lessened concern for the stigma of bankruptcy.

4. Compare *U.S. v. Kras,* 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973) in which the Supreme Court found the filing fee requirement for bankruptcy constitutional because, among other reasons, "bankruptcy is not the only method available for the adjustment of his legal relationship with his creditors." 409 U.S. at 445, 93 S.Ct. at 638. The court also held "There is no constitutional right to obtain a discharge of one's debts in bankruptcy." 409 U.S. at 446, 93 S.Ct. at 638.

5. The premises and conclusions of the Purdue Study were not universally accepted. One article has stated "we are persuaded * * * that this study's depiction of consumer bankruptcy is generally unreliable and misleading and that it does not offer a sound basis for any contemporary discussion of bankruptcy policy." Sullivan, Warren and Westbrook, "Limiting Access

to Bankruptcy Discharge: An Analysis of the Creditors' Data", Wisc.L.Rev. 1983: 1091 at 1093 (hereinafter the "Sullivan Critique"). A reply to Sullivan Critique may be found in Sullivan, "Reply: Limiting Access to Bankruptcy Discharge", Wisc.L.Rev.1984: 1069. See also Sullivan, Warren and Westbrook, "Rejoinder: Limiting Access to Bankruptcy Discharge", Wisc.L.Rev. 1984: 1087.

6. However, the court does not mean to suggest that exactly 100% is the magic number. Ninety-nine percent would do as well, and in some cases even considerably lower figures might suffice. The debates respecting the minimum Chapter 13 payment are a mirror to the Code § 707(b) considerations. See, e.g., *Barnes v. Whelan,* 689 F.2d 193 (D.C.Cir.1982); *Deans v. O'Connell,* 692 F.2d 968 (4th Cir.1982); *In re Scher,* 12 B.R. 258 (Bankr.S.D.N.Y.1981); and *In re Sotter,* 28 B.R. 201 (Bankr.S.D.N.Y.1983).

7. In the debates before Congress, many reasons were given for the significant increase in individual Chapter 7 filing following adoption of the Bankruptcy Code in 1978. The consumer credit industry placed stress on changes that were asserted to make bankruptcy easier. Others put forth that the rise was essentially unrelated to any increased liberality in the Bankruptcy Code but could be attributed to judicial decisions removing the prior proscriptions on attorney ad-

ry Chapter 13 has been stated as follows:

"[T]here remains the central policy issue that provoked the Purdue Study: should consumer's discharges be made contingent on their being held to the poverty level for five years while they attempt to pay debts out of future income?

"Those apt to choose bankruptcy are the undisciplined, the unfortunate or the fraudulent. The latter often beat any system, but happily they are few in number. The unfortunate deserve a discharge, a hope for tomorrow for themselves and their families. The undisciplined are not admirable, but neither are they criminal. They are the ones most likely to think that a 'jingle in your jeans' sounds good. We should not permit purveyors of high risk credit to lure the undisciplined further into debt and then to use the great, expensive engine of the law to collect their debts by making the undisciplined live for five years at the poverty level—nor should we be sanguine about getting the undisciplined to work for five years without financial reward." Sullivan Critique at 1146.

Congress declined to adopt a compulsory Chapter 13, added Code § 707(b), and made certain other consumer amendments. Although Code § 707(b) may have the effect of relegating a debtor to Chapter 13 if he wants any bankruptcy relief, any decision to utilize Chapter 13 remains that of the debtor.

■■■ Turning to the facts of the case at hand, the court is satisfied that the Debtors have little prospect of being able to propose or complete a meaningful Chapter 13 plan and thus that the Debtors may receive a Chapter 7 discharge. In bringing on its order to show cause, the court noted that by the Debtors' own account they had a budget surplus of $184 per month. That amount per month paid over three years would total $6,624 or about 50% of the principal of their scheduled debts. The court also noted that the Debtors had listed $250 per month for recreation. If 75% of

that amount, or $187.50, were added to the admitted budget surplus, then 100% of the principal of scheduled debts could be repaid in three years. Finally, the Debtors listed their combined 1984 income at $60,000 per year, which places them in an income bracket well above the national average. Their total debts are approximately 25% of their stated gross income.

The debtors' employment appeared stable. Mr. Edwards is a nuclear medicine technologist and Mrs. Edwards is a pavillion clerk, both being employed by a major New York teaching hospital. Both the low debt to income ratio and the high income distinguished the Edwards from other Chapter 7 and 13 debtors. The stated and potential budget surpluses, combined with the low debt to income ratio and the high income, caused this court to conclude that these debtors were potentially the types of debtors that the credit industry and Congress believed to be abusing Chapter 7 and for whom Code § 707(b) was designed.

The Debtors submitted two affidavits in response to the court's order to show cause which provide additional information essential to an understanding of the Debtors' financial circumstances and which reflect their economic circumstances are not as they first appear. The Debtors' affidavit provided additional family and financial information. The second affidavit was that of Luther R. Gatling, the president of Budget and Credit Counseling Services, Inc. ("BuCCS"), a not for profit corporation designed to assist individuals and families in financial trouble. BuCCS had assisted the Debtors in filing their Chapter 7 petition.

In his affidavit, Mr. Gatling states that Mr. and Mrs. Edwards have been clients of BuCCS since December 1983. BuCCS tentatively set up a repayment program for the Edwards in January 1984 but the required monthly deposits proved impossible for the Edwards to maintain and no disbursements were made to creditors. In the

vertising which resulted in an increased public awareness of the availability of bankruptcy, a national economic recession and lessened com-

munity stigma to bankruptcy. This sharp debate concluded with the adoption of the consumer credit amendments contained in BAFJA.

fall of 1984, the Edwards returned to BuCCS after several creditors proceeded to judgment and an income execution was obtained on Mr. Edwards' salary. They then requested assistance in filing a bankruptcy petition. The Edwards attended a bankruptcy orientation program on December 14, 1984 and filed their Chapter 7 petition on January 25, 1985. Mr. Gatling states:

> "In our opinion, given the correct budget of the EDWARDS, there exists no viable way these debts can be repaid without affecting their ability to provide for themselves and their children."

It appears BuCCS currently has over three hundred clients repaying their debts in full through the BuCCS PLAN repayment program. Mr. Gatling states that, for approximately 10% of BuCCS' clients, bankruptcy is the recommended solution and that only where a debt repayment plan appears impossible . or proves unsuccessful does BuCCS offer bankruptcy assistance to its clients.

The Edwards state in their affidavit that they have three children, ages 4, 7 and 12. Mrs. Edwards is pregnant and their fourth child is expected in July. Because of her pregnancy, Mrs. Edwards expects to stop working during May 1985, which will reduce their monthly take-home pay by $950.

When Mrs. Edwards returns to work after a period of some months, child care expenses will increase by an undetermined amount.

The Debtors have also provided an amended schedule of current income and expenses.[8] The amended schedule shows $100 per month for recreation, a reduction from the prior $250, $100 per month for church contributions, $20 per month for allowances and $25 per month for home maintenance.

In view of the impending loss of a second income, it is apparent that projections of future ability to pay based on the present two-income status are inappropriate. Further it can be anticipated that there will be new expenses associated with the anticipated baby. The upcoming income reduction forecloses the need for the court to examine present expenses to see if money could be made available for a plan.[9]

The worst that can be said of the Debtors is that they are undisciplined. They were unable to carry out a pre-filing repayment plan in the year prior to filing. Their family is due to increase momentarily. The Edwards are as likely to gain discipline by being freed of past debt through obtaining a Chapter 7 discharge as they are by being

---

**8.** The amended schedule totals expenses at $2409 and income at $2550, a monthly surplus of $141. However, the listed expenses total only $1844, apparently because of an oversight in including the $540 listed for child care and tuition on the earlier schedule and $25 for hairdresser. With these additions the total would be correct.

**9.** Whether a family of five should spend $100 a month ($25 per week) on recreation instead of paying creditors is a matter of judgment. Surely some recreation is justifiable and beneficial to family harmony and happiness. The stated amount is neither excessively luxurious, nor is it penurious. Likewise, it may be questioned whether church contributions of $100 a month should come ahead of repayment to creditors. Having a fourth child may be a questionable luxury. At what point such inquiries and decisions by a bankruptcy court would become an affront to society's sensibilities or the U.S. Constitution remains uncertain. The U.S. Supreme Court has said: "If the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so funda-

mentally affecting a person as the decision whether or not to bear or beget a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972). See also *Everson v. Board of Education*, 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 ("Neither [a state nor the federal government] can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion"). But see and compare *U.S. v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973), *supra*, at footnote 4. These assessments of personal life choices, of course, be avoided or substantially mooted by either not filing a petition, withdrawing it or converting the case to one under Chapter 13. But see and compare Bankruptcy Code § 1325(b)(1)(B) and (b)(2) under which a Chapter 13 debtor may be required to devote all of his projected disposable income for the next three years to plan payments, with disposable income defined as income not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent.

forced to live either with a continued wage garnishment or with a Chapter 13 plan. They cannot get another discharge for six years. Any doubts the court might still have are overcome by the presumption in the Debtors' favor.[10] Some comment is warranted on the procedure adopted by the court for handling § 707(b) motions. The court receives a copy of and reviews each bankruptcy petition assigned to it. This review had provided beneficial insight to the court and has taken but a few minutes of the court's time per petition. The benefits of this review became more apparent when the court became the assigned judge for all Chapter 13 cases assigned to this venue in the district. Prior review and ready access to the petitions has proved beneficial in dealing with matters arising in the case.

Review of all petitions provides a comparison framework for debt, income and expense data. Certain petitions simply leap out as unusual. For example, shortly after Code § 707(b) became effective, the court reviewed a Chapter 7 petition that appeared to present an abuse. Only a single debt of several thousand dollars for a student loan was listed and the stated income and expenses of the debtor revealed no apparent reason why the debt could not be paid in full in a matter of less than a year. An order to show cause issued for dismissal under Code § 707(b). That petition was dismissed on the nonappearance of the debtor. Since then only one or two a month of the petitions reviewed have warranted further inquiry through a § 707(b) order to show cause.

The present order to show cause has caused the court to question how it should go about the process of obtaining additional information. Here the Debtors submitted two affidavits supplying additional information. No evidentiary hearing was held due to the court's heavy calendar on the date of the hearing and the absence of any request by the Debtors for such a hearing. In addition, the affidavits appeared to supply the answers to a number of questions, such as what efforts the Debtors had made to repay their creditors and why with such an apparently high income they were seeking a Chapter 7 discharge. The court has tried to find a procedural *ratio decidendi* for itself in this case and future cases. In the future, the court intends to notify the debtor that the debtor will be permitted to testify if he wishes or rely solely on a written response. Based on the procedure this court now adopts, the burden and responsibility placed on the court by Code § 707(b) is relatively minimal. In time, performance of the court's responsibility under Code § 707(b) will become as second nature to the court in time as the court's responsibility under Code § 329 to review for excessiveness attorneys' fees paid in contemplation of bankruptcy has become.

Practices used in conducting reviews of fees for excessiveness will provide useful guidance. In discussing the management of the inquest pursuant to former Bankruptcy Act § 60(d), the statutory predecessor of Code § 329, at the Fourth Seminar for Referees in Bankruptcy held March 1967, Referee Conley S. Brown stated:

"In the absence of action by any other qualified party I have always thought that the referee is the most logical one to act where the excessive payments might have been made to the bankrupt's bankruptcy attorney. There was considerable support for the view that the referee should not set himself up as the prosecutor and judge in any case where there must be extensive examinations and cross-examinations of witnesses. I submit, however, that *the great bulk of cases involve simple non-business bankruptcies which are ordinarily handled on certain set fees throughout the en-*

---

**10.** Denying access to Chapter 7 to debtors whose debts are not yet overwhelming might actually work against creditor interests generally. Such debtors discharge less indebtedness and are barred from seeking an additional Chapter 7 discharge for six years. See Bankruptcy Code § 727(a)(8). It would appear undesirable to encourage debtors in need of bankruptcy relief to delay filing and possibly incur further debts they will ultimately prove unable to pay by insisting on high debt to income ratios.

*tire jurisdiction.* When these simple appearing cases appear before the referee indicating that an attorney has received gross excess payments from the norm, the referee is the most logical one to question since he does not run into conflict. *It is more in the nature of an inquiry than a litigated hearing."* (Emphasis added). Proceedings of Fourth Seminar for Referees in Bankruptcy, Clark Boardman Company (1961) at 503.

To enable the court to perform its function under § 329, Rule 2017 of the Bankruptcy Rules requires that attorneys file a statement reciting the fees paid or agreed to be paid. The Advisory Committee Note to Rule 2017 states:

"This rule ... implements § 329 of the Code. Information required to be disclosed by the attorney for a debtor by § 329 of the Code and by the debtor in his statement of financial affair * * * will assist the court in determining whether to proceed under this rule."

This fee statement is strikingly similar to the vehicle which enables the court to act under Code 707(b), to wit the statement of the debtor's current income and expenditures required by the amendment to Code § 521 included in the BAFJA consumer amendments.

The practice which has developed on fee inquests is that the attorney responds to the motion by filing a fee application in the usual form. If a trustee has been appointed, the trustee may undertake to carry on an inquiry initiated by the court. In the usual case, the court rules on the basis of the fee application and no sworn testimony is taken.

■■■ This is the procedure that the court perceives Congress envisioned for it

to employ under Code § 707(b).[11] A sound implementation of Code § 707(b) in the manner as described above would enable the court to determine in a uniform manner whether a Chapter 7 case was appropriate for dismissal as a substantial abuse. The court is satisfied that the initiation of an inquiry by way of its own motion and subsequent receipt from a debtor of a written response to the points noted by the court, in addition to any testimony the debtor wishes to give, would satisfactorily enable the court to render a fair and prompt decision.

■■■ Applying such a procedure is logical, practical and reasonable. It avoids unduly burdening the court with evidentiary hearings at which it must be judge and prosecutor and displaces any possible intrusion on constitutional due process restraints. The statutory presumption under Code § 707(b) in favor of granting relief to a debtor has the apparent result of requiring the court, as the movant, to go forward with the evidence, conduct examination and cross-examination of the debtor and witnesses. See Federal Rule of Evidence 301 ("In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes upon the party against whom it is directed the burden of going forward to rebut or meet the presumption * * * "). It seems unlikely that Congress intended or envisioned that the court would engage in pretrial discovery or subpoena third-party witnesses in connection with Code § 707(b). This problem is a real one under Code § 707(b) because the section explicitly states that the motion may be made only by the court, and not at the request or suggestion of any party in interest. Thus, unlike a fee inquiry in which the trustee or

---

**11.** It remains for appropriate Bankruptcy Rules to be adopted to implement Code § 707(b). One of the predecessor proposed consumer amendment bills provided:

"(2) Prior to dismissing any Chapter 7 case for substantial abuse, the court shall set forth, in writing within twenty days of the permanent designation of relief made by the debtor * * * its reasons for finding that substantial abuse would occur; and the court shall, at the

same time, advise the debtor of his right to respond in writing and/or to request and secure a hearing on the court's findings. The court shall establish, by rule, time limits for the debtor's response and for the court's written findings in response thereto. No creditor or representative of a creditor may participate in judicial proceedings relating to substantial abuse except upon the request of the court." S. 445 (98th Congress, 1st Session), Sect. 203.

the U.S. Trustee, or even the debtor or a creditor, could and possibly would take over prosecution of an inquiry initiated by the court, it would appear that no such party in interest could take over the prosecution of a 707(b) motion.

Issue can be taken as to the fairness of an inquisitorial proceeding because of a potential infringement upon the neutrality requirement implicit in the due process rights afforded under the Constitution. See, e.g., *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudication proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decision-making process * *. The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law * * *. At the same time, it preserves both the appearance and reality of fairness, 'generating the feeling, so important to popular government, that justice has been done' * * * by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him."); *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases."); *cf. Withrow v. Larkin*, 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1974) ("Concededly, a 'fair trial in a fair tribunal is a basic requirement of due process.' [However] the contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry."). See also *Doubleday & Company, Inc. v. Curtis*, 763 F.2d 495 (2d Cir.1985) ("Among the

cardinal principles of our Anglo-American system of justice is the notion that the legal parameters of a given dispute are framed by the positions advanced by the adversaries, and may not be expanded *sua sponte* by the trial court." 763 F.2d at 502).

Based upon the facts set forth in the two affidavits submitted by the Debtors in this case and the presumption in favor of granting the Debtors the relief requested, the court finds that the Debtors' petition is not a substantial abuse of Chapter 7. The court's motion is withdrawn.

It is so ordered.