**In re David W. HAMZE, Debtor.**

**Bankruptcy No. 85–07881.**

United States Bankruptcy Court, E.D. Michigan, S.D.

Sept. 11, 1985.

**38**

James D. Smiertka, for First Federal Sav. Bank & Trust.

Diane L. Otto, for Citizens Commercial & Sav. Bank.

James L. Rowe, for debtor.

George B. Rasch, trustee.

## OPINION RE: § 707(b) SUBSTANTIAL ABUSE DISMISSAL

ARTHUR J. SPECTOR, Bankruptcy Judge.

The Court set this case for a hearing on the question of whether it should be dismissed pursuant to § 707(b) of the Bankruptcy Code.

The debtor is a wage earner who works in the produce department of a grocery store. He has 16 years seniority and is a member of a union which has acceded to some concessions in its most recent collective bargaining agreement. His gross wage is $7.95 per hour, yielding an after tax net pay of $1010.00 per month. The debtor is married with 4 minor children. He is renting an apartment and has a car payment of $238.00 per month to Retail Store Employees Credit Union for his 1981 Buick automobile. He has no other secured debt, but his unsecured indebtedness is approximately $21,282.76. His budget filed pursuant to § 521 shows unremarkable living expenses. In short, on the surface, there appears nothing at all unusual about his circumstances, and certainly nothing which would appear to warrant an inquiry under § 707(b).

However, when we reviewed the file at the suggestion of the Deputy Clerk for Estate Administration, we noticed that the debtor had apparently incurred $16,109.50 in consumer debt in a period of between 117 days and 40 days prior to the filing of the Chapter 7 petition for relief. These transactions constituted a red flag to possible substantial abuse of Chapter 7. We sent a notice to all parties in interest that the Court would hold a hearing to determine whether the case ought to be dismissed under § 707(b) of the Code, and invited interested parties to intervene as "private attorneys general" of sorts to prosecute the affirmative. Two creditors, Citizens Commercial and Savings Bank and First Federal Savings Bank & Trust accepted the invitation, allowing this Court to assume a neutral posture rather than a prosecutorial one.

At the hearing the foregoing facts were established. In addition, the debtor explained that he had incurred the recent $16,000 in consumer debt in anticipation of his taking a trip to his native Beirut, Lebanon to visit with his family.[1] He claimed that he took with him about twice what he thought he would need for his sojourn, and intended to return the balance to the lenders upon his return to the United States, but felt that due to the instability in the

---

**1.** We do not know exactly which members of the debtor's family were in Lebanon.

region, the prudent thing was to carry extra money just in case.[2] As it turned out, though, his family's home had been shelled, receiving substantial damage, necessitating the expenditure of an additional $5,000 for hotel accommodations and taxi fare. Additionally, he gave most of the balance, amounting to approximately $7,000, to his family to allow them to rebuild; of the $15,000 with which he went to Beirut, he returned with $52.00 in his pocket.

It is obvious that the case is one filed by an individual debtor under Chapter 7 whose debts are primarily consumer debts. However, whether or not the debtor's rendition of chronology and state of mind is true, we are of the opinion that this is not a case of substantial abuse of Chapter 7 as that term is used in § 707(b) of the Code.

Section 707(b) is a compromise between the proponents and opponents of a "means test" for availability of Chapter 7 relief. The lobbyists for the consumer credit industry touted a study, (the Purdue study), which tended to support their argument that many individuals who could afford to repay their voluntarily acquired consumer debts had, as a result of the liberalization of bankruptcy relief, opted instead to obtain complete Chapter 7 discharges. This, they argued, was an abuse of Chapter 7 of the Bankruptcy Code.

Although Congress may have acknowledged that abuses occur, it did not adopt the measures sought. Instead, it gave bankruptcy judges specific textual authority to dismiss such cases *sua sponte*, but without delineating any substantive guidelines or standards to assist them in determining which cases should be deemed abusive.

From the foregoing history, we think we are able to discern Congress' intent that § 707(b) be utilized narrowly to weed out the types of cases which most upset the lobbyists for a means test. As stated recently: "Both the legislative background to adoption of Code § 707(b) and the creditor protections against bankruptcy abuse long found in other sections of the Bankruptcy Code have caused the court to determine that the debtor's future ability to pay is the proper focus of Code § 707(b)." *In re Edwards*, 50 B.R. 933, 13 B.C.D. 250, 252, n. 3 (Bankr.S.D.N.Y.1985).

In this case, it is obvious that the debtor lacks the ability now or in the foreseeable future to pay his debts. Thus Chapter 7 was and is an appropriate vehicle for his relief. If the debts were incurred in a fraudulent or abusive manner, the Code gives the alleged victims ample means to seek redress through an action under § 523. Indeed, the intervenors have already acknowledged their willingness and ability to seek prompt determinations as to the dischargeability of their particular debts. We see no reason to engraft a new parallel remedy of dismissal when the only "abuse" in the case is the origin of the debt(s). *In re Christian*, 51 B.R. 118, 13 B.C.D. 313 (Bankr.D.N.J.1985). Accordingly, the Court entered an order withdrawing its motion to dismiss the case.

---

2. It was the debtor's testimony that he brought approximately $15,000 with him to Beirut for his own potential needs rather than his family's. He claims to have had no notice that his family's home (situated in a neighborhood beset by battles between Shiite and Palestinian forces) had been bombed before he left the United States. He further testified that due to his family's circumstances, he was forced to live in a hotel at a cost of $150.00 per day, and that other routine expenses, such as taxi fare, had become exorbitant as a result of the state of anarchy existing in the city. The debtor also told the Court that he was forced to remain in Lebanon approximately 10 days longer than expected because Beirut Airport was closed as a result of the infamous hijacking of a TWA jet, and because other routes of egress were too expensive or too dangerous.