**In re Ronald Carlester WALTON, Appellant/Debtor.**

**No. 87-736 C (5).**

United States District Court, E.D. Missouri, E.D.

Nov. 18, 1986.

Frank J. Niesen, St. Louis, Mo., for Walton.

A. Thomas DeWoskin, Clayton, Mo., trustee.

## MEMORANDUM

LIMBAUGH, District Judge.

This cause is before the Court on appeal from an order of the United States Bankruptcy Court for the Eastern District of Missouri.[1] On January 10, 1986, the Bankruptcy Court dismissed the appellant's Chapter 7 petition pursuant to 11 U.S.C. § 707(b) after determining that granting the debtor a discharge of his pre-petition debts would constitute a "substantial abuse" of the Bankruptcy Code. Appellant Ronald Carlester Walton contends on appeal that the Bankruptcy Court improperly dismissed his petition. He seeks an order from this Court reversing the Bankruptcy

---

1. The Honorable Robert E. Brauer, United States Bankruptcy Judge for the Eastern District of Missouri.

Court and reinstating his liquidation proceedings.

Appellant Walton has submitted a memorandum of law in support of his position. In addition, the record on appeal includes the Bankruptcy Court's findings of fact and conclusions of law, a transcript of the Bankruptcy Court's hearing on December 6, 1985, and various financial schedules filed by the debtor. The Court must accept the Bankruptcy Court's findings of fact unless they are clearly erroneous. Bankr.R. 8013.

### Statement of Facts

Appellant/debtor Walton initiated liquidation proceedings under Chapter 7 of the Bankruptcy Code, 11 U.S.C., on July 11, 1985. The Bankruptcy Court conducted a hearing on December 6, 1985, as contemplated in 11 U.S.C. § 707(b). This provision reads,

> After notice and a hearing the court, on its own motion and not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

After examining Walton's financial situation, the Bankruptcy Court on January 10, 1986, dismissed his Chapter 7 petition, but stayed the order pending this appeal. The Bankruptcy Court then filed a memorandum on April 4, 1986, in which it set forth the basis for dismissing the petition.

Debtor Ronald Carlester Walton is a thirty-two year-old man employed by the maintenance department at Anheuser-Busch, Inc. in St. Louis, Missouri.[2] He has been married to Velma Lee Walton for about twelve years. The two are the parents of two children, ages eight and 13, and Mrs. Walton is the natural mother of another child, age 15. Apparently, the Walton's family situation fluctuates from time to

time. At the time of the hearing, the Waltons were living under one roof although Mrs. Walton and the debtor were not cohabitating. Prior to that time, Mrs. Walton and the children lived away from Mr. Walton. Mr. Walton earns approximately $400.00 per week from his job at Anheuser-Busch. Although Mrs. Walton has worked for the federal government in the past, she received an injury at work in April, 1985, and has not returned to work.

The schedules filed by the debtor reflect the following debts:

| Judgments | |
|---|---|
| Laclede Gas | $ 965.00 |
| **Taxes** | |
| Internal Revenue Service | $ 400.00 |
| **Secured Debt** | |
| U.S. Dept. of Housing and Urban Development (HUD) (Home mortgage) | $55,000.00 |
| **Unsecured Debts** | |
| James Criscione, M.D. (Feb., 1983 operation) | $ 600.00 |
| Cardinal Glennon Hospital (1982–83 Amelda Walton) | $ 600.00 |
| Anheuser-Busch Credit Union (1983 note) | $ 6,000.00 |
| Laclede Gas (gas service) | $ 900.00 |
| Cashex (check cashing service) | $ 1,100.00 |
| Security Storage System (furniture storage 1984) | $ 100.00 |
| Medical Dental Account (children's teeth) | $ 300.00 |
| Jewish Hospital (for spouse 1983–84) | $ 600.00 |
| Metropolitan Sewer (sewer service 1983) | $ 100.00 |
| Union Electric Co. (electric service 1984) | $ 300.00 |
| Incarnate Word Hospital (operation) | $ 500.00 |
| Gateway Account Service | $ 500.00 |
| Internists, M.D. (medical bills) | $ 400.00 |
| G.C. Services | $ 400.00 |
| Division of Family Services (AFDC to State) | $ 6,984.00 |

2. The Court will use the present tense in depicting the facts found by the Bankruptcy Court.

| Unsecured Debts—Continued | |
|---|---|
| Century 21–Halls Ferry (management of house) | $ 1,600.00 |
| Roue Motors (payment of repossession) | $ 800.00 |
| Home Cinema (movie rentals) | $ 300.00 |
| Total scheduled unsecured debt | $22,084.00 |

| | |
|---|---|
| home loan payment | $ 350.00 |
| utilities | $ 135.00 |
| food | $ 175.00 |
| clothing | $ 25.00 |
| laundry | $ 40.00 |
| newspapers | $ 5.00 |
| medical expenses | $ 100.00 |
| transportation | $ 150.00 |
| recreation/club | $ 40.00 |
| taxes | $ 175.00 |
| additional support (children) | $ 301.00 |
| Total monthly expenses | $1,496.00 |

Apparently, the $965.00 judgment against the debtor represents the same debt to Laclede Gas as the $900.00 unsecured debt listed in the schedules. Consequently, the Court will not count both the judgment and the scheduled debt in its consideration of the debtor's status. The debtor has also included a number of debts for services rendered by health care providers to his spouse. Since Walton has included these debts in his schedules, the Court must assume he has legal responsibility for these obligations. Finally, the market value of the home he owns in the entireties with his wife is $51,000.00.[3] The Waltons have no equity in the home since the outstanding mortgage totals $55,000.00, exclusive of interest. In fact, given these figures, HUD has a $4,000.00 unsecured claim against the estate in addition to the $51,000.00 allowed secured claim. The total unsecured debt in the schedules, including the priority tax claim and HUD's unsecured claim, is $26,484.00.

The Bankruptcy Court found that although Walton lists his income as $400.00 per week, for a total of $1,600.00 per month, $1,733.00 is a more accurate monthly figure since there are, on average, more than twenty-eight days in a month. In addition, the Bankruptcy Court added to this monthly figure the sum of $85.00, which represents plaintiff's tax refund prorated over twelve months. The debtor's total monthly income, then, is $1,818.00.

The debtor claims the following monthly expenses:

The scheduled monthly expenses total $1,496.00 even though the debtor and the Bankruptcy Court cite a higher figure, $1,596.00. In addition, the Bankruptcy Court reduced this figure, finding that Walton could not justify the inclusion in his schedule of monthly expenses of $175.00 for taxes and $100.00 for medical care. While the Bankruptcy Court properly held that the debtor could not justify the inclusion of the tax expense in the schedule, the record does not support the decision to exclude the medical care expense. The Bankruptcy Court based its decision to delete this expense on the fact that "Anheuser Busch ... is known to provide generous health and welfare benefits to its employees." This reference to general knowledge outside the record does not constitute a proper use of judicial notice. *See* Bankr.R. 9017 (Federal Rules of Evidence apply in bankruptcy hearings) and Fed.R. Evid. 201. The appropriate figure for monthly expenses, then, is $1,496.00 less $175.00 or $1,321.00. The difference between this amount and the debtor's monthly income of $1,818.00 is $497.00. This surplus would total $5,964.00 over twelve months.

Several other factors influenced the Bankruptcy Court's decision to dismiss Walton's bankruptcy petition. The present case is not his first foray into bankruptcy. He received a discharge in 1974 in Chapter VII liquidation proceedings. The Bankruptcy Court also determined that the debtor gambles away some of his salary at

---

**3.** The Court cannot determine from the record whether it should consider the debtor's mortgage debt when analyzing his financial situation. See 11 U.S.C. § 541 (property of the estate). However, since the debtor cites the existence of the mortgage debt and the significant arrearage in his house payments in support of his contention that he needs a discharge, the Court will assume the debtor has the legal responsibility for this obligation.

work and, in general, does not show much fiscal restraint. In particular, the debtor could not explain what he did with the money he should have used to make his house payments.

### Legal Analysis

This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 158(a), and will limit its analysis to a determination of whether the Bankruptcy Court correctly dismissed the debtor's Chapter 7 petition on January 10, 1986. The pertinent statute, 11 U.S.C. § 707(b), requires a two-part analysis. The Court must first determine whether Walton's debts are "primarily consumer debts," and, if so, whether the Bankruptcy Court properly concluded that granting him a discharge would constitute a "substantial abuse" of the Bankruptcy Code. *In re Kelly*, 57 B.R. 536, 538 (Bankr.D.Ariz.1986); and *In re Kress*, 57 B.R. 874 (Bankr.D.N.D.1985).

### I.

### "Primarily Consumer Debts"

■ Consumer debts are those "incurred by an individual primarily for a personal, family or household purpose." 11 U.S.C. § 101(7). All of the scheduled debts relate to the personal needs of the debtor and his family and, consequently, they seem to fit within the category of consumer debts. However, other courts have looked more closely at this statutory language. In *In Re White*, 49 B.R. 869 (Bankr.W.D.N.C. 1985), the Bankruptcy Court focused on three key words, noting,

> In general, to *'incur'* an obligation is to meet with it, to become liable to or to bring it down on oneself. For an incurrence to have been *'primarily'* for a personal purpose means that this incurrence was of the first importance or was fundamental. To have a *'purpose'* is to have an intention or an object set before oneself as an aim.

*Id.* at 872, *citing, Webster's New Collegiate Dictionary* (1958). The Bankruptcy Court in *White* applied these definitions to the situation there and determined that a tort judgment arising from an automobile accident was not a consumer debt for purposes of 11 U.S.C. §§ 707(b) and 101(7).

The court in *White* reached this result after determining that the inclusion of these specific words in the statute limited the class of consumer debts to those obligations willingly entered into. *Id.* In addition, the Bankruptcy Court noted that Congress enacted the dismissal provision in § 707(b) to preclude persons who over-extend themselves by making consumer credit purchases from discharging those debts and, in effect, raising the cost of consumer credit to others. *Id.* at 872–73. Consequently, the court further limited the definition to those obligations resulting from purchases of products on credit. *Id.* If the Court were to follow this approach, Walton could make a reasonable argument that most of his debts do not relate to the purchases of goods on credit and, therefore, are not consumer debts for purposes of § 707(b). However, the actual language of § 707(b) does not support the narrow definition of consumer debt set forth in *White.* Rather, it suggests the term should include those debts a person would ordinarily expect to incur in his daily affairs other than business expenses. The distinction drawn by the Bankruptcy Court in *White* between purchases on credit and other types of transactions has no rational relation to whether a debtor is conducting his personal life within his means. Similarly, whether a debtor incurred a liability through volition has no real significance. For example, Walton's AFDC liability and that owed for movie rentals both arise from the same lack of discipline in meeting ordinary personal obligations. That the debtor obviously did not seek the former obligation while he willingly chose to rent movies should have no legal significance.

Virtually all of the scheduled debts, including the unsecured portion of the mortgage debt owed to HUD,[4] fall within the

---

4. Mortgage debts are consumer debts for pur-      poses of 11 U.S.C. §§ 101(7) and 707(b). *In re*

definition of consumer debt in 11 U.S.C. § 101(7). Consequently, the Court finds that the debtor's obligations are primarily consumer debts and will proceed to the next stage of the analysis.

## II.

### *"Substantial Abuse"*

■ Unlike the term "consumer debt," the Bankruptcy Code does not define the term "substantial abuse." While the courts have developed a number of approaches to this issue, the most important factor appears to be the ability of the debtor to pay a substantial portion of his debts in the future. *In re Kress*, 57 B.R. at 877–78; *In re Kelly*, 57 B.R. at 539; *In re Hamze*, 57 B.R. 37, 39 (Bankr.E.D.Mich. 1985); *In re Bell*, 56 B.R. 637, 641 (E.D. Mich.1986). Essentially, this factor relates to the feasibility of a payment plan under Chapter 13, 11 U.S.C. §§ 1301 *et seq. Id.*

Further, the Bankruptcy Court in *Kress* considered other factors relevant to this inquiry, including

2. Whether the debtors [sic] petition was filed as a consequence of illness, disability, unemployment or some other calamity;

3. Whether the schedules suggest the debtors incurred cash advancements and consumer purchases in excess of their ability to repay them;

4. Whether the debtors [sic] proposed family budget is excessive or extravagant;

5. Whether the debtors [sic] Statement of Income and Expenses is misrepresentative of their true financial condition.

*Id.* at 878; *see also In re Grant*, 51 B.R. 385, 393–94 (Bankr.N.D.Ohio 1985). Since these other factors do not militate strongly either for or against dismissal of the debtor's petition under 11 U.S.C. § 707(b), the Court will focus on his ability to pay his debts in the future through a Chapter 13 plan. *See In re Hudson*, 56 B.R. 415, 420 (N.D.Ohio 1985) ("[T]he primary focus should be on the question of whether or not

the debtor may propose a confirmable Chapter 13 Plan.").

The Court must determine whether Walton could propose a workable Chapter 13 payment plan which the Bankruptcy Court could confirm. The plan would need to provide for payment of unsecured debts totaling, at most, $26,484.00 plus interest over five years. *See* 11 U.S.C. § 1322(c) (bankruptcy court "for cause" can approve plans which provide for payments during a period up to five years). Plaintiff can contribute approximately $6,000.00 per year to a plan. As a result, he could make payments totaling $30,000.00 over five years. Even if these payments would not totally cover the unsecured claims, interest and trustee's fee, if any, such a plan would satisfy the confirmation requirement that unsecured creditors receive all of the debtor's disposable income over the duration of the plan. 11 U.S.C. § 1325(b)(1)(B). These unsecured creditors would certainly receive more under this type of plan than in a straight liquidation. 11 U.S.C. § 1325(a)(4).

Obviously, Walton would have a difficult time curing his default in his house payments which, as of January 10, 1986, totalled approximately $12,000.00. However, the Bankruptcy Court could confirm a plan that provides for surrender of the encumbered property to the lien holder. 11 U.S.C. § 1325(a)(5). Since the debtor has no equity in the property, this course of action would benefit him financially. While he would still be responsible for the unsecured portion of the debt to HUD, he would not otherwise be responsible for the arrearage. The expenses associated with leasing an apartment would not greatly increase his housing costs over the $350.00 expense he lists in his schedule.

The Court finds, then, that the debtor could reasonably propose a workable Chapter 13 payment plan which the Bankruptcy Court could approve. None of the other relevant factors delineated above suggests the Bankruptcy Court erred when it dismissed the debtor's petition. Circumstanc-

*Kelly*, 57 B.R. at 539; and *In re Bryant*, 47 B.R.    21, 26 (Bankr.W.D.N.C.1984).

es present in Walton's financial situation adequately rebut the statutory presumption in 11 U.S.C. § 707(b) that he should receive a discharge of his debts. Consequently, the Court will affirm the Bankruptcy Court's order of January 10, 1986, dismissing the debtor's petition.