**In re Donald L. WEGNER and Marjorie A. Wegner, Debtors.**

**Bankruptcy No. 4–88–2185.**

United States Bankruptcy Court, D. Minnesota.

Oct. 21, 1988.

Michael J. Fadlovich, U.S. Trustee's Office, Minneapolis, Minn., for movant, U.S. trustee.

Craig W. Andresen, Peterson Law Office, Bloomington, Minn., for debtors.

## ORDER DENYING MOTION TO DISMISS

ROBERT J. KRESSEL, Chief Judge.

This case came on for hearing on the United States Trustee's motion to dismiss this case under 11 U.S.C. § 707(b). Michael R. Fadlovich appeared for the United States Trustee. Craig W. Andresen appeared for the debtors. This court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 103(b). This is a core proceeding. Based on the evidence, the arguments of counsel and the file in this case, I make the following memorandum order:

### FACTUAL BACKGROUND

Donald and Marjorie Wegner filed their joint chapter 7 petition on June 1, 1988. Their Schedule A–3 lists unsecured debts of $123,129.00, of which $104,845.00 represents unpaid balances on the debtors' twenty-six credit cards.[1] Their schedules list no priority creditors and only one secured creditor, First Minnesota Savings Bank, which holds a $62,253.00 mortgage on the debtors' homestead. In addition to the debtors' homestead, which is listed in their schedules as having a value of $95,000.00, the debtors list personal property valued at $26,005.00, including household goods of $4,525.00, wearing apparel and personal possessions of $5,100.00, automobiles, including a 1979 Buick Electra and a 1974 Ford Maverick, of $2,400.00, office equip-

---

1. The total includes at least twenty-three different Visa and Mastercards, all of which were obtained by completing unsolicited applications from banks all over the country.

ment of $1,800.00, and pensions of $11,418.00. Almost all the debtors' property was claimed as exempt under Minnesota Statutes §§ 510.02 and 550.37.

Donald Wegner was, at the time the petition was filed, and continues to be, employed by Control Data Corporation as a senior consultant in software design. His monthly take home pay is $4,176.54. Marjorie Wegner was employed as a secretary at the time of the filing. Her monthly take home pay was $855.49. However, she stopped working in early August following a suicide attempt. The debtors are supporting their 23 and 27 year old sons, their 17 year old daughter, and, to some degree, their 27 year old son's former wife and two children. The debtors' original Schedule of Current Expenditures listed estimated monthly expenses of $2,496.60. The debtors' Amended Schedule of Income and Expenditures lists estimated monthly expenses of $2,664.09. Accordingly, the debtors currently have net monthly disposable income of at least $1,512.45.[2]

On June 20, 1988, the United States Trustee moved to dismiss this case under § 707(b)[3] asserting that the debtors are seeking chapter 7 relief although they have an ability to pay substantial portions of their debts.

At the original hearing, I raised the issue of whether the debtors' high credit card debt would be grounds for dismissal under § 707(b). Since the United States Trustee's motion did not make an issue of the debtors' credit card debt, the original hearing on the motion was continued to give the debtors the opportunity to explain the circumstances under which they incurred their credit card debt. To that end, the debtors submitted a Supplementary Response to Motion to Dismiss indicating that their credit card debt resulted almost entirely from cash advances. The debtors also submitted a summary of cash advances obtained and credit card payments made over the six year period preceding the filing of the petition:

|  | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|---|
| Cash Advances | $12,950 | 14,600 | 26,500 | 44,000 | 37,013 | 42,100 |
| Credit Card Payments | $ 9,156 | 10,577 | 20,166 | 34,847 | 43,748 | 45,429 |

The debtors indicated that the balance on the credit cards in the spring of 1985 was approximately $44,000; in the spring of 1986 the balance was approximately $60,000.00; in the spring of 1987 the balance was approximately $85,000. By the time the debtors filed their petition, the balance had grown to nearly $105,000.00. Because the average annual interest rate on the cards was approximately 20%, a large portion of the increased balance was attributable to interest. At the time of filing, the total of all minimum monthly payments

required on the debtors' unsecured obligations was $3,928.04.

## DISCUSSION

Section 707(b) of the Bankruptcy Code provides:

After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of

2. At the hearing on the United States Trustee's motion, the debtors presented yet another schedule of expenses totalling $3,846.51. Because of my disposition of this motion, it is unnecessary to address the appropriateness of some of the expenses or their amounts.

3. Notice of the motion was given to all creditors. None of the creditors appeared at the hearing or otherwise responded to the motion. Apparently, the debtors' creditors consider bankruptcies just another cost of doing business to be passed along to other consumers in the form of higher interest rates.

relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

11 U.S.C. § 707(b).

### (1) *Primarily Consumer Debts*

Section 707(b) applies only to cases filed by individuals whose debts are primarily consumer debts. 11 U.S.C. § 707(b). The Bankruptcy Code defines a consumer debt as a "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(7).

The debtors incurred their scheduled obligations primarily for personal, family, or household purposes, and hence, these obligations are "primarily consumer debts" as defined by the Bankruptcy Code. The debtors' schedules describe $110,230.00 of their $123,129.00 in unsecured liabilities as "consumer debt." The majority of this debt was incurred in the form of credit card cash advances used primarily for daily living expenses. In addition, the debtors' $62,253.00 homestead mortgage, their only secured debt, is a consumer debt as defined in § 101(7). *In re Bryant*, 47 B.R. 21, 26 (Bktcy.W.D.N.C.1984).

### (2) *Substantial Abuse*

The only issue remaining is whether the granting of chapter 7 relief to the debtors would be a substantial abuse of the provisions of chapter 7. Neither the statute nor the legislative history define "substantial abuse." Accordingly, courts interpreting substantial abuse in the context of § 707(b) have fashioned a variety of definitions and approaches. Some courts have applied the "ordinary, plain meaning" of substantial abuse. *In re Bryant*, 47 B.R. 21 (Bktcy.W. D.N.C.1984). Still others have adopted the

dictionary definitions of the words "substantial" and "abuse." *In re Edwards*, 50 B.R. 933, 936 (Bktcy.S.D.N.Y.1985). Based on the events leading up to the enactment of § 707(b), many courts have agreed that the "single most important indicator of substantial abuse is the presence of enough disposable income to realistically enable [the] debtor to repay a significant portion of his debts through a Chapter 13 plan." *Matter of Strong*, 84 B.R. 541, 545 (Bktcy. N.D.Ind.1988). Several courts have held that the debtor's ability to fund a chapter 13 plan is sufficient, in itself, to constitute "substantial abuse" under § 707(b). *See, e.g., In re Kelly*, 841 F.2d 908 (9th Cir. 1988).

While a debtor's ability to fund a chapter 13 plan may be among the factors to be considered in determining whether dismissal for substantial abuse is appropriate, it is not the only measure of substantial abuse. This is particularly clear in this case, where the debtors are ineligible for chapter 13 relief because their noncontingent, unliquidated, unsecured debts exceed the statutory limit.[4] In addition, the debtors are not engaged in business, and hence, are ineligible for chapter 11 relief under the Eighth Circuit's decision in *Wamsganz v. Boatman's Bank of De Soto*, 804 F.2d 503 (8th Cir.1986).

The language of § 707(b) does not define "substantial abuse" in terms of a debtor's ability to pay his debts through a chapter 13 plan; in fact, § 707(b) makes absolutely no reference to the debtor's ability to fund a chapter 13 plan. A common thread running through most of the cases dismissed for substantial abuse is the existence of some "egregious circumstance,"[5] or evi-

---

**4.** 11 U.S.C. § 109(e) provides:

    (e) Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $100,000 and noncontingent, liquidated, secured debts of less than $350,000, or an individual with regular income and such individual's spouse, except a stockbroker or a commodity broker, that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that

aggregate less than $100,000 and noncontingent, liquidated, secured debts of less than $350,000 may be a debtor under chapter 13 of this title.

11 U.S.C. § 109(e).

**5.** *See In re Shands*, 63 B.R. 121, 124 (Bktcy.E.D. Mich.1985) (the debtor's ability to pay 100% of her debts within three years, when coupled with "some egregious circumstance," is sufficient to trigger dismissal for substantial abuse).

dence of bad faith [6] or "unfair advantage" [7] on the part of the debtor.[8] Lists of factors considered by some courts in determining whether dismissal for substantial abuse is appropriate frequently include some reference to the debtor's bad faith [9] or misrepresentation.[10]

▮ Rather than adopting any particular list of factors as determinative of substantial abuse, I find that substantial abuse in the context of § 707(b) requires some evidence of misconduct, impropriety, or lack of good faith on the part of the debtors. While it may well be evidence of substantial abuse, the fact that the debtors have substantial net disposable income is, in and of itself, insufficient to establish substantial abuse. This interpretation is consistent with the language of the statute. "Abuse" means "improper use or handling" or "a corrupt practice or custom." The American Heritage Dictionary 70 (2d College Ed. 1982). "Substantial" describes the degree of abuse required for dismissal.[11] In determining whether evidence of such abuse exists, the court should examine the totality of facts and circumstances surrounding the debtors' affairs and the events leading to the bankruptcy filing. These circumstances must be viewed in light of the statutory presumption in favor of the relief sought by the debtors. 11 U.S.C. § 707(b).

### (a) The Credit Card Debt

▮ Viewing only the circumstances surrounding the incurring of the credit card debt, I conclude that granting these debtors relief would not be a substantial abuse of the provisions of chapter 7. There is no evidence of any misconduct, deception, or lack of good faith on the part of these debtors. I acknowledge that the accumulation of over $100,000.00 in credit card debt, in and of itself, may be considered egregious by some, including me. However, up until the stock market crash on October 19, 1987, the debtors believed they could pay off their credit card debts. However naive or unreasonable this belief may have been, I do not doubt the debtors' sincerity. In addition, the summary of credit card payments made by the debtors since 1982, including payments of $43,748.00 in 1986 and $45,429.00 in 1987, demonstrates the debtors' efforts, however futile, to reduce

6. See In re Keniston, 85 B.R. 202, 223 (Bktcy.D. N.H.1988) ("the dismissal power under section 707(b) is not essentially different from the established power of a bankruptcy court to dismiss a petition under any chapter of the Bankruptcy Code that is filed with a lack of good faith or as an abuse of the process under §§ 105(a) and 707(a) of the Code"); In re Krohn, 87 B.R. 926 (N.D.Ohio 1988) (whether the debtor exhibited bad faith in the filing of his petition and schedules or engaged in "eve of bankruptcy purchases" are factors to be considered in deciding whether substantial abuse exists).

7. See In re White, 49 B.R. 869, 875 (Bktcy.W.D. N.C.1985) (implicit in the substantial abuse language of 707(b) is "some type of an unfair advantage that is obtained by the Debtor because of his filing as against his creditors").

8. In In re Shands, 63 B.R. 121 (Bktcy.E.D.Mich. 1985), the debtor's intent to file bankruptcy "against her ex-husband" was an egregious circumstance which, together with her ability to pay $113.00 per week for debt service, constituted a substantial abuse of chapter 7. Similarly, a debtor's disregard of his duties to truthfully list all his obligations, or to disclose his general financial position to the court, together with the relatively exorbitant lifestyle he sought to main-

tain warranted dismissal in In re Bryant, 47 B.R. 21 (Bktcy.W.D.N.C.1984). A debtor-physician's bad faith transfer of all profits from his lucrative medical practice to himself and his wife as tenants by the entireties in an effort to avoid paying a medical malpractice judgment against him justified dismissal for substantial abuse in In re Brown, 88 B.R. 280 (Bktcy.D.Hawaii 1988).

9. See In re Krohn, 78 B.R. 829, 832 (Bktcy.N.D. Ohio 1987), aff'd, 87 B.R. 926 (N.D.Ohio 1988) (one of the factors which the court considers in determining whether a petition for chapter 7 relief should be dismissed for substantial abuse is whether the debtor has exhibited any bad faith in the filing of his petition and schedules).

10. See In re Peluso, 72 B.R. 732, 738 (Bktcy.N.D. N.Y.1987) (among the factors to be considered in determining substantial abuse is whether the debtors' statement of income and expenses is misrepresentative of their true financial condition).

11. "The dismissal option of section 707 is not available in all chapter 7 cases or even in all cases where a creditor is harmed but is granted only where there exists a substantial abuse." In re White, 49 B.R. 869, 875 (Bktcy.W.D.N.C.1985) (emphasis in original).

their indebtedness. Finally, with the notable exceptions of the debtors' purchase of a $2,700 fur coat and their retention of a cleaning person at a cost of $32.00 per week, there is little evidence in the schedules or the record in this case that the debtors used their cash advances to purchase luxury goods or services or to maintain an extravagant lifestyle.

Instead, the debtors have essentially supported two families since 1981 and viewed the credit card cash advances as the only chance they had to "finance the families." When the debtors' son Michael was married in 1981, the debtors assisted Michael and his wife with rent, food expenses, and car payments. After Michael and his wife separated in 1983, the debtors continued to provide financial support to their daughter-in-law and two grandchildren, as well as to Michael, who moved in with the debtors at the time of the separation and has lived with them ever since. Because Michael was struggling to pay school loans and child support, the debtors stopped asking him to contribute to household expenses. The debtors' 23 year old son Mark has also lived with the debtors when not away at school. The debtors have taken out loans for Mark's education, as well as paying for his car insurance, repairs, and other general living expenses.

The financial burden of supporting two families was compounded by the debtors' personal crises, including the fact that their teenage daughter ran away from home five times between November 1985 and August 1986. The turmoil from these events diverted the debtors' time and attention from their financial affairs. Marjorie Wegner attempted suicide in August and was hospitalized for several days thereafter and is no longer working outside the home.

In support of his motion, the United States Trustee asserts that the debtors had no legal obligation to support their adult children and grandchildren and did so at the expense of their creditors. However, the debtors were motivated by charity and a sense of moral, if not legal, responsibility for their family, not by any attempt to enrich themselves or deprive their creditors. While it is clear that the debtors' efforts to financially assist their family lead, in part, to the debtors' substantial credit card debt, there is no evidence that those efforts were anything but well-intentioned.

### (b) Ability to Pay Debts

Next, I turn to the debtors' disposable income of over $1,500.00. The United States Trustee asserts this income could be used to pay substantial portions of the debtors' obligations. However, as noted, the debtors are precluded from utilizing chapter 13 to repay their debts because their unsecured debts exceed the statutory limit in § 109(e). In view of the Eighth Circuit's decision in *Wamsganz, supra,* the debtors are similarly precluded from utilizing chapter 11 to repay their debts. Accordingly, the only bankruptcy relief available to these debtors is chapter 7. If the debtors were eligible for chapter 13 or chapter 11, interest would stop accruing on their unsecured debt, 11 U.S.C. § 502(b)(2), and they would be able to pay a meaningful amount of their debts under a plan.[12] If I dismiss this chapter 7 case, the debtors will be faced with minimum monthly credit card payments of approximately $3,928.04 from take-home pay of $4,176.56, while interest continues to accrue on the unpaid credit card balances. Assuming an average annual interest rate of 20% on the debtors' $104,845.00 in credit card debt, monthly interest alone will amount to ap-

---

**12.** But for the Eighth Circuit's decision in *Wamsganz,* I would dismiss this case. Although the debtors' substantial credit card debt alone, because of how it was incurred, would not constitute substantial abuse, that debt combined with the debtors' ability to pay a portion of their debts in chapter 11 would lead to a finding that granting chapter 7 relief to these debtors would be substantial abuse. The result is anomalous. If the debtors had incurred debts within the

chapter 13 limits, they would be forced to pay some of their debts. But because they were greater spendthrifts, they will be discharged. This demonstrates a new axiom that pigs are put on a diet but hogs are set free. The anomaly results not from the statute, but from the Eighth Circuit's amendment to 11 U.S.C. § 109(d). I invite the United States Trustee to appeal so that the Eighth Circuit can rethink its position.

proximately $1,750.00—$237.55 more than the debtors' disposable income of $1,512.45. It is obvious from these facts that the debtors will not be able to pay even a portion, much less a "meaningful portion," of their debts outside bankruptcy.

If this case were dismissed, it is almost certain the debtors would never recover financially. Rather, dismissal would only exacerbate the debtors' financial plight, without resulting in any meaningful payments to their creditors.

## CONCLUSION

There is no question that this case arises from the debtors' financial irresponsibility. However, were the courts to dismiss every chapter 7 case filed by a financially irresponsible debtor, chapter 7 as a form of relief would soon be extinct.

THEREFORE, IT IS ORDERED: The United States Trustee's Motion to Dismiss under § 707(b) is denied.