**In re Martin E. LEE, Sandra S. Lee, Debtors.**

**Bankruptcy No. 92–80660.**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Dec. 20, 1993.

B. Morris Martin, McKenzie, Martin, Taylor & McConnaughey, Atlanta, GA, for debtors.

James H. Morawetz, Guy G. Gebhardt, Atlanta, GA, for U.S. Trustee's Office.

### *ORDER*

MARGARET H. MURPHY, Bankruptcy Judge.

This case is before the court on the U.S. Trustee's motion to dismiss pursuant to 11 U.S.C. § 707(b). Debtors filed a brief in opposition to the U.S. Trustee's motion. Hearing was held and the parties filed post hearing briefs and Debtors filed amended schedules. For the reasons set forth below, this case is dismissed pursuant to § 707(b).

In the schedules Debtors initially filed with their Chapter 7 bankruptcy petition, Debtors showed a net monthly income of $3,581.43 and total monthly living expenses in the amount of $2,064.00, leaving a net disposal income of $1,517.43. The schedules also show Debtors' total unsecured debt equals $15,384.71. An analysis of these amounts shows Debtors would have the ability to repay 100% of their unsecured debt in less than 12 months.

The brief filed by Debtors in response to the U.S. Trustee's motion was accompanied by an affidavit which disclosed a recent move by Debtors' family from Arkansas to Georgia and the return home of Debtors' older son. Debtors also have a 13–year–old son. The affidavit corrected an error in Debtors' take home pay to show it as $3,549.98. Additionally, Debtors adjusted their monthly living expenses upward by $1,346. The adjusted monthly expenses included $700 per month for food, $400 per month for transportation (exclusive of car payments), $100 per month for entertainment, and $350 per month as a tithe to Berean Baptist Church. Debtors filed amended schedules which show a net disposable income of $226.98.

An affidavit by the pastor of Berean Baptist Church was presented by Debtors with their post-hearing brief. That affidavit showed that Debtor Martin E. Lee recently became a deacon in the church. The affidavit avers that election to deacon requires a deacon to fulfill his "stewardship" responsibilities. The pastor states in his affidavit that tithing is a part of a church members' stewardship responsibilities. The pastor also states that if a prospective deacon "cannot faithfully attend to the responsibilities outlined in the Church Constitution, including the stewardship responsibilities, he is asked to exempt himself from further consideration as a Deacon." The Church Constitution provides that a deacon must "[b]e faithful in personal Bible study and prayer, soulwinning activities, stewardship responsibilities, and faithful church attendance unless providentially hindered."

Debtor Martin Lee's affidavit avers that he believes his obligation to tithe arises not from his position as deacon but from the obligations imposed upon him by God as a Christian. He admits, however, that previously, in times of financial hardship, he has not tithed. Debtors' tithing to Berean Baptist Church began in January, 1993, shortly after Debtors' Chapter 7 bankruptcy petition was filed.

### CONCLUSIONS OF LAW

Section 707 provides:

(a) The court may dismiss a case under this Chapter only after notice and a hearing and only for cause, including—

(1) Unreasonable delay by the debtor that is prejudicial to creditors;

(2) Nonpayment of any fees and charges required under Chapter 123 of Title 28; and

(3) Failure of the debtor in a voluntary case to file, within 15 days or such addi-

tional time as the court may allow after the filing of the petition commencing such case, the information required by ¶ (1) of § 521, but only on motion by the United States Trustee.

(b) After notice a hearing, the court, on its own motion or on a motion by the United States Trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this Chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this Chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

Because a presumption exists in favor of according relief to a debtor, the burden of proof is upon the U.S. Trustee to show a debtor's case should be dismissed.

Section 707(b) was enacted as a part of the Bankruptcy Amendments and Federal Judgeship Act of 1984 (hereinafter "1984 Amendments"), in response to criticisms leveled at the Bankruptcy Reform Act of 1978 (hereinafter "Bankruptcy Code") by the consumer credit industry.[1] The legislative history of § 707(b) indicates its enactment was the result of perceived abuses by Chapter 7 and Chapter 13 debtors which resulted from the liberal provisions of the Bankruptcy Code.[2] The provisions of the Bankruptcy Code which were blamed for such abuses were the expansive automatic stay, the overly generous exemption standards, the broadened scope of discharge protection, the Debtor's unfettered choice to elect a no-asset Chapter 7 liquidation, and the lack of any meaningful payment requirement as the con-

dition to confirmation of Chapter 13 plans. Breitowitz, *New Developments in Consumer Bankruptcy: Chapter 7 Dismissal on the Basis of "Substantial Abuse"*, 59 Amer. Bankr.L.J. 327 (1985).[3]

The consumer credit industry alleged it suffered significant losses as a result of the increase in the number of bankruptcies which followed the enactment of the Bankruptcy Code. *Id.* A study conducted by the Credit Research Center affiliated with the Krannert School of Management of Purdue University concluded that a significant percentage of the number of persons filing for relief under Chapter 7 would be able to pay most or all of their debts from their excess disposable income without undue hardship. *Id.* Those debtors were, however, filing Chapter 7 petitions under which creditors received nothing on their claims.

■ The proposals made to Congress, including proposals which would limit access to Chapter 7 based on a debtor's ability to pay his debts under Chapter 13, failed to gain sufficient support for enactment prior to 1984. *Id.* Then, amidst the frenetic legislating in 1984 to amend the Bankruptcy Code to overcome the constitutional defect identified in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), Congress passed the Consumer Credit Amendments, including the enactment of § 707(b). No definition of the term "substantial abuse" is contained in § 707(b) or elsewhere in the Bankruptcy Code.[4] The Senate Report which accompanied the enactment of § 707(b), however, sheds some light on Con-

---

**1.** *See,* 130 Cong.Rec.H. 1808 *et seq.* (daily ed. March 21, 1984). *See also* the discussion of the legislative history of § 707(b) in the case of *In re Grant,* 51 B.R. 385 (Bankr.N.D.Ohio 1985).

**2.** The 1984 Amendments also added § 1325(b) which mandates that the debtor utilize all his disposable income to make payments under the plan unless unsecured creditors can be paid in full through a smaller distribution. In addition, the 1984 amendments provided through § 1329(a) that the plan may be modified at the request of an unsecured creditor, presumably modified upward if debtor's economic situation improves.

**3.** *See also,* Andrea M. Proia, *The Interpretation and Application of Section 707(b) of the Bankruptcy Code,* 93 Comm.L.J. 367 (1988).

**4.** The U.S. Senate passed a bill in 1992 containing an amendment to add the following sentence to § 707(b): "The court shall find that a petition constitutes a substantial abuse of this chapter if the petition was filed in bad faith or if the debtor, without substantial hardship, has the ability to pay the debtor's debts as they become due." S.1985, 102d Cong., 1st Sess. Title III, § 308 (1991), approved by the Senate June 19, 1992.

gressional intent behind the passage of § 707(b):

> This provision represents a balancing of two interests. It preserves the fundamental concept embodied in our bankruptcy laws that debtors who cannot meet debts as they come due should be able to relinquish non-exempt property in exchange for a fresh start. At the same time, however, it upholds creditors' interests in obtaining repayment where such repayment would not be a burden. Crushing debt burdens and severe financial problems place enormous strains on borrowers and their families. Family life, personal emotional health, or work productivity often suffers. By enabling individuals who cannot meet their debts to start a new life, unburdened with debts they cannot pay, the bankruptcy laws allow troubled borrowers to become productive members of their communities. Nothing in this bill denies such borrowers with unaffordable debt burdens bankruptcy relief under Chapter 7. However, if a debtor can meet his debts without difficulty as they become due, use of Chapter 7 would represent a substantial abuse.

S.Rep. No. 98–65 to accompany S. 445, 98 Cong., 1st Sess. (1983) p. 43. Thus, it appears that the primary purpose for the enactment of § 707(b) was to provide for dismissal of the Chapter 7 cases of debtors who can pay their debts from their excess disposable income.

The decision of the Ninth Circuit in *Zolg v. Kelly,* 841 F.2d 908 (9th Circuit 1988), holds that a debtor's ability to pay his debts defines substantial abuse. In the *Kelly* case, the debtors filed a Chapter 7 bankruptcy petition primarily to discharge a judgment debt of approximately $25,000. Before filing bankruptcy, the Kellys paid off all their unsecured creditors, consolidating some of their debt into their secured line of credit. Mr. Kelly sold his one-third interest in his law firm for the nominal sum of $100. The Kellys listed $181,350 in assets and $147,000 in debts secured by mortgages against their home. The debtors claimed a $50,000 homestead exemption. The debtors also listed an excess monthly income of $441. Their actual

excess monthly income was substantially more because certain of their monthly expenses were found by the bankruptcy court to be excessive. *In re Kelly,* 57 B.R. 536 (Bankr.Ariz.1986).

The Ninth Circuit examined most of the cases which had been decided under § 707(b) and concluded that the overwhelming majority of cases held "that the principal factor to be considered in determining substantial abuse is the debtor's ability to pay the debts for which a discharge is sought." *Kelly,* 841 F.2d at 913. The Ninth Circuit, however, went one step further by concluding that "a finding that a debtor is able to pay his debts, standing alone, supports a conclusion of substantial abuse." *Id.* at 914.

In the case of *Green v. Staples,* 934 F.2d 568 (4th Cir.1991), the court was not persuaded by the *Kelly* holding that ability to pay, standing alone, would support dismissal under § 707(b). The Fourth Circuit adopted a **totality of the circumstances test** which involved evaluation of factors such as:

1. Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

2. Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

3. Whether the debtor's proposed family budget is excessive or unreasonable;

4. Whether the debtor's schedules and statement of current income and expenses reasonable and accurately reflect the true financial condition; and

5. Whether the petition was filed in good faith.

*Id.* at 572. *See also, In re Woodhall,* 104 B.R. 544 (Bankr.M.D.Ga.1989); *In re Strong,* 84 B.R. 541 (Bankr.N.D.Ind.1988); *In re Kress,* 57 B.R. 874 (Bankr.D.N.D.1985).

An even clearer rejection of the holding in *Kelly* is found in the case of *In re Keniston,* 85 B.R. 202 (Bankr.D.New Hamp.1988). The *Keniston* court adopted a narrow construction of § 707(b) espoused in a University of Pennsylvania law review article by Karen Gross, *Preserving a Fresh Start for the Individual Debtor: The Case for Narrow Construction of the Consumer Credit Amend-*

*ments,* 135 Univ.Penn.L.Rev. 59 (1986). The *Keniston* court concluded:

> [T]he dismissal power under § 707(b) is not essentially different from the established power of a bankruptcy court to dismiss a petition under any chapter of the Bankruptcy Code that is filed with a lack of good faith or as an abuse of process under §§ 105(a) and 707(a) of the Code.

Both the law review article and the *Keniston* Court engage in an extensive analysis of the Bankruptcy Code to conclude that the focus of § 707(b) should be on whether the debtor is an "honest" debtor as distinguished from a "dishonest" debtor rather than focusing on the single rigid standard of whether a debtor can repay creditors out of future income. *Keniston,* 85 B.R. at 222. An honest debtor is one who has "unfortunately" incurred debts he cannot repay; a dishonest debtor is one who has "systematically defrauded" his creditors. Gross, 135 U.Pa. L.Rev. at 101.

An analysis of the cases cited by both *Keniston* and *Kelly,* however, shows that while courts have focused on the debtor's ability to pay as the principal factor in determining substantial abuse, the courts have by no means focused on ability to pay as the sole factor for determining substantial abuse.[5] In the case of *In re Edwards,* 50 B.R. 933 (Bankr.S.D.N.Y.1985), the debtors' monthly net income was $2,550. They listed $184 monthly surplus income, which would have enabled them to pay 100% of their unsecured debt over a three-year period. The court noted the difficulty in determining substantial abuse based on objective data alone. The court also noted that it should accord great weight to the debtors' own assessment of their financial condition.

After conducting a hearing in that case, the court concluded a dismissal for substantial abuse would be improper because facts and circumstances not apparent in the debtors' schedules indicated the debtors' petition was not a substantial abuse of the provisions of Chapter 7. Specifically, the debtors had three children and were expecting a fourth. As a result, the wife's income would be lost while expenses due to pregnancy and child care would increase. In addition, prior to filing the bankruptcy petition, the debtors sought assistance from a credit counseling service but were unable to maintain the payments devised by that service. The credit counseling service recommended that the debtors file bankruptcy. Thus, the *Edwards* court concluded the Edwards were "honest" debtors entitled to seek relief under Chapter 7.[6]

In the case of *In re Kress,* 57 B.R. 874, the debtor's yearly income was $90,000 and total unsecured debts were $38,000. The debtor overstated his expenses by $1,000 per month. In dismissing the case, the court relied not solely on the debtor's ability to pay but on the totality of the circumstances, including the debtor's earning potential and his extravagant monthly expense statement.

In the case of *In re Hudson,* 56 B.R. 415 (Bankr.N.D.Ohio 1985), the court listed several factors to be considered in determining substantial abuse. Among these were the aggregate amount of the debtor's income, the ratio between monthly income and monthly expenses, the percentage that could be paid to unsecured creditors, the hardship imposed under Chapter 13, the number of unsecured creditors, the amount of unsecured debt, the nature of the unsecured debt, the motivation for filing under Chapter 7, whether the debtor exhibited good faith in the prosecution of the case, and whether the debtor fully and

---

**5.** Even in the *Kelly* case, although the court concluded ability to pay could be the sole factor for determining substantial abuse, the facts of the *Kelly* case show that the debtors, in addition to having the ability to pay, were also abusing the provisions of Chapter 7 by attempting to manipulate the chapter's provisions to discharge a single, unsecured judgment debt. The judgment debt which the *Kelly* debtors sought to discharge consisted primarily of attorney fees which had been awarded against them for abusive litigation.

**6.** Of interest is an example given by the *Edwards* court of circumstances, similar to those in the instant case, which that court found would constitute substantial abuse. The example was a Chapter 7 debtor with a single debt of several thousand dollars for a student loan. The debtor's stated income and expenses revealed no reason why the debt could not be paid in full in less than a year. That case was dismissed pursuant to § 707(b). *Edwards,* 50 B.R. at 941.

accurately disclosed his monthly income and expenses. The court allowed the debtors a final opportunity to amend their schedule of current income and current expenditures to accurately reflect their financial status, finding discrepancies and inconsistencies rendered the evidence before the court unreliable for a determination of the § 707(b) issue.

In the case of *In re Bell,* 56 B.R. 637 (Bankr.E.D.Mich.1986), the debtor showed an income in excess of $3,000 per month with $127,000 in general unsecured debt and $5,500 in taxes owed. The court noted that fraud and other means of abuse not involving a debtor's ability to pay was dealt with elsewhere in the Bankruptcy Code, specifically in §§ 523, 727, and 707(a). The court also noted that in determining whether to dismiss a case for substantial abuse, the court should consider the effect of dismissal on the debtors versus the effect of the discharge on the creditors. In *Bell,* the court characterized the debtor's statement of expenses as extravagant. For example, the debtor listed $608 per month in transportation expenses which included the lease of a luxury car, and food expenses for one person of $480 per month which included frequent meals at restaurants. In dismissing the case, the court concluded:

> [I]t is unfair and inequitable for the debtor to request that this Court discharge his debts while he accumulates substantial disposable income over the next several years while living a relatively high life style.

In the case of *In re Struggs,* 71 B.R. 96 (Bankr.E.D.Mich.1987), the court's analysis appeared to focus only on the debtor's ability to pay. The debtor's monthly income was $4,900 with expenses of approximately $3,800 and an excess of approximately $1,100 per month. The court noted debtor had incurred a $16,000 secured debt for a Cadillac automobile and a $16,000 secured debt for a motor home. The court described those items as luxury items. Although not specifically stated, it was clear the court considered the totality of the circumstances, including the nature of the debtor's secured debts in addition to the debtor's ability to pay his unsecured debt from excess monthly income in

determining that the case should be dismissed pursuant to § 707(b).

In the case of *In re Gaskins,* 85 B.R. 846 (Bankr.C.D.Cal.1988), the debtors' income was over $70,000 per year. The debtors' excess annual income was over $6,000 per year. The debtors' unsecured debt was approximately $30,000, most of which was credit card debt. The debtors had recently received an income tax refund of $8,300 which they had used to buy their third new car. The court noted that the use of the tax refund to buy a new car indicated an unwillingness on the part of the debtors to pay their debts. The court also noted that a three-year Chapter 13 plan would pay 54% of the unsecured debt. The case was dismissed under § 707(b).

In the case of *In re Krohn,* 87 B.R. 926 (N.D.Ohio 1988), the district court affirmed the bankruptcy court's dismissal of the case under § 707(b). The court stated the bankruptcy court had properly based its decision to dismiss on the evaluation of the debtor's ability to pay, the debtor's bad faith in filing his petition as exhibited by "eve of bankruptcy purchases", and that the debtor had suffered no unforeseen calamity and was merely using Chapter 7 provisions to gain relief from past excesses.

In the case of *In re Strong,* 84 B.R. 541, the court found the presumption contained in § 707(b) in favor of granting relief to the debtor can be overcome by the debtor's substantial disposable income. In the *Strong* case, the debtor had surplus monthly income of over $1,000 and unsecured debt of approximately $11,000. The court noted it was appropriate to consider the factors set forth in *Kress,* and its progeny (discussed *supra*).

In a recent case, *In re Wegner,* 91 B.R. 854 (Bankr.D.Minn.1988), the court concluded that "the fact that the debtors have substantial net disposable income is, in and of itself, insufficient to establish substantial abuse." The court in *Wegner* also refrained from adopting a list of factors to consider in determining substantial abuse. The court held a finding of substantial abuse must be supported by some evidence of the debtor's "misconduct, impropriety, or lack of good faith." An ability to pay the debt from net

disposable income is merely evidence of such misconduct, impropriety or lack of good faith.

In *Wegner*, the debtors had amassed over $100,000 in credit card debt. The debtors had a net monthly disposable income of over $1,500. Debtors were ineligible for relief under Chapter 13 or Chapter 11. The court found that, until the stock market crash in October, 1987, the debtors had an honest belief, however naïve and unreasonable it may have been, that they would be able to pay their credit card debt. The court also noted little evidence that the debtors used the cash advances from the credit cards to purchase luxury items and that more than one family crisis had contributed to the debtors' financial burden while diverting their attention from their financial affairs. Additionally, the court analyzed the allegations concerning debtors' ability to pay their debts. Because the debtors were ineligible for relief under Chapter 13 or Chapter 11, interest would continue to accrue on their debts. The monthly interest alone on their credit card debt constituted more than their net monthly disposable income. The court concluded that financial irresponsibility alone is insufficient cause to deny relief under Chapter 7.

"Ability to pay" means "ability to pay a **substantial** portion of unsecured debts." *In re Scheinberg*, 132 B.R. 443 (Bankr.D.Kansas 1991), *aff'd* 134 B.R. 426 (D.Kan.1992). Although "substantial" is not strictly defined, the courts appear to have granted motions to dismiss under 707(b) only where the evidence showed Debtor could pay 75 to 100% of the unsecured claims over a period of 3 to 5 years. For example, in the case of *In re Wegner*, 91 B.R. 854, debtors had excess monthly income of $1,500 but had unsecured debt of over $100,000, dismissal was denied.

■ An analysis of the case law reveals no clear standard for determining substantial abuse. Although ability to pay is certainly a principal factor, most courts also consider other factors, including a debtor's subjective bad faith. Such bad faith, however, does not appear to be a requirement for a finding of substantial abuse.[7] Other considerations include the circumstances which precipitated the filing of the bankruptcy petition, the reasonableness of the debtor's proposed family budget, the debtor's lifestyle before or after the filing of the petition, the debtor's earning potential and the financial burden which the filing of a Chapter 13 case would create. Analyzing the totality of the circumstances to determine whether Debtors' petition represents a substantial abuse is appropriate.[8] *In re Busbin*, 95 B.R. 240 (Bankr. N.D.Ga.1988).

In the instant case, Debtors' excess monthly income set forth in the amended schedules equals approximately $228. The central issue involving Debtors' monthly expenses, however, is whether Debtors' payment of $350 per month to Berean Baptist Church as a tithe is reasonable in Debtors' circumstances.

The issue of the reasonableness of tithing in a substantial abuse analysis has not been addressed by the courts. Analogous issues, however, have arisen under §§ 1325 and 548 of the Bankruptcy Code. Courts address the issue at two levels. First, does the statutory language permit a debtor to contribute money to their church at the expense of their creditors? Second, if the statutory language does not allow the contributions, has the government thus denied the debtor the First Amendment right to the free exercise of religion by prohibiting such contributions?

Within the totality of the circumstances approach, a court must consider "[w]hether the debtor's proposed family budget is excessive or unreasonable." *Green*, 934 F.2d 568. In determining what is excessive or unreasonable, cases involving section 1325(b)(2)(A) (necessary expenses "for the maintenance or

7. Subjective bad faith alone would probably be grounds for dismissal under § 707(a).

8. Debtors also assert, with little argument, that application of ability to pay as the sole grounds for dismissal as substantial abuse violates the Equal Protection Clause of the Fourteenth Amendment. Therefore, the conclusion that a totality of the circumstances analysis is appropriate renders Debtors' equal protection argument moot. Additionally, Debtors' constitutional argument has not fared well in the courts. *See*, *In re Kelly*, 841 F.2d at 916; *In re Higginbotham*, 111 B.R. 955 (Bankr.N.D.Okla.1990); *In re Heller*, 160 B.R. 655 (D.Kansas, 1993).

support of the debtor or a dependent of the debtor") provide persuasive authority.

The courts are not in agreement on the issue of whether a tithe is a necessary expense for the maintenance and support of a debtor. In the cases in which the courts have denied confirmation of Chapter 13 plans that include tithes, the debtors' contributions were not required by the church and the tithe was substantial with respect to the debtor's monthly payment. In the case of *In re Curry,* 77 B.R. 969 (Bankr.S.D.Fla.1987), the debtor presented a chapter 13 plan for confirmation in which he proposed monthly payments of $125 and tithes to his church of $103. "The debtor [was] an ordained minister employed by the church as a teacher." *Id.* at 969. The church did not require the donations. The court emphasized that the contributions constituted almost half of the debtors' disposable income. While the court did not question the sincerity of the debtor's religious convictions and recognized that the contributions had also been made before the bankruptcy, the court held that the contribution was not a necessary living expense. The court reasoned that the contributions would have the effect of requiring the debtor's creditors to contribute to his church and refused to confirm the plan. *Accord, In re Sturgeon,* 51 B.R. 82 (Bankr.S.D.Ind.1985) (court concluded that a tithe is not a necessary living expense); *In re Reynolds,* 83 B.R. 684 (Bankr.W.D.Mo.1988) (tithing is not a necessary living expense but nominal contribution is allowed).

The court arrived at a similar result in the case of *In re Breckenridge,* 12 B.R. 159 (Bankr.S.D.Ohio 1980). In *Breckenridge,* the court denied confirmation of a chapter 13 plan because the court determined that the debtors had not presented the plan in good faith. In determining good faith the court looked to the overall picture presented by the debtors. The court considered several factors: (1) the "reasonably recent prior bankruptcy of [the debtor], combined with the low percentage dividend to unsecured claimants, (2) retention of imprudently purchased assets, and (3) the devotion of a sig-

nificant portion of the debtors' income to the payment of an entirely discretionary expenditure, a church tithe...." *Id.* at 160. While stating that tithes are not *per se* objectionable, the court opined that because of the debtors' severe financial condition they should "devote maximum resources" to the repayment of their obligations and leave tithing to a time when they could better afford it. *Id.* at 160. The court also noted that without the tithing allocation the debtors could propose a Chapter 13 plan whose dividend to creditors would be well over 70%. *Id.* at 160. The court, therefore, denied confirmation of the plan. *Id.* at 160.

In the case of *In re Bien,* 95 B.R. 281 (Bankr.D.Conn.1989), the court arrived at an opposite conclusion and allowed the debtor to make religious contributions. The issue again was whether a tithe in a chapter 13 debtor's plan is "reasonably necessary ... for the maintenance and support of the debtor." The relevant inquiry, the court stated, was "whether the proposed expense fulfills a *bona fide* personal commitment intended to serve or promote some religious or spiritual purpose, rather than an effort to hinder, delay or defraud creditors." *Id.* at 282.[9]

In *Bien,* the debtor had been a full tithe-paying member of the Mormon church for five and one-half years. A full tithe-paying member must pay 10% of gross monthly income to the Church and in return may attend services and pray in the central church in Salt Lake City, Utah. Additionally, a full tithe-paying member enjoys eligibility for positions of service within the church. After examining the totality of the circumstances, the court upheld the religious contribution because "[1] [r]eligious participation is a fundamental part of many people's lives ... [2] [t]he church tithe is a condition precedent to full participation in the debtor's religion, and [3] the ... expense ... serves a bona fide religious and spiritual purpose." *Id.* at 282.

In the case of *In re Navarro,* 83 B.R. 348 (Bankr.E.D.Pa.1988), the court also held that tithing was necessary for the support and maintenance of the debtor. In *Navarro,* a

**9.** The court maintained that because the amount of the contribution was specific and nondiscre-

tionary it would not question the proper amount of the contribution.

creditor objected to the confirmation of a chapter 13 plan because the plan provided for a tithe to the debtor's church.[10] The debtor testified that she and her family are devoutly religious and that she considers her obligation to tithe "central to her personal beliefs and tenets of her faith." *Id.* at 351. The debtor also stated that "she considered her obligation to tithe to be indispensable so that she would find a way to continue to do so no matter how the court rules in this matter." *Id.* at 351.

The court reasoned that religious contributions are not luxury items because the debtors do not obtain a tangible benefit or increased standard of living. Rather the contributions arose "purely out of the debtors' conviction that they are essential for the spiritual and moral well-being of the family." *Id.* at 356. The court also noted the debtor's testimony that "tithing is a family practice of long-standing." *Id.* at 357. The court concluded that religious contributions may be "consistent with expenditures reasonably necessary for the maintenance and support of chapter 13 debtors" and allowed the tithes.[11] *Id.* at 356–57.

In both *Bien* and *Navarro* the courts premised their decision on the debtors' well-established history of tithing. The court in *Navarro* recognized the debtors' long-standing practice of tithing and debtor's testimony that she would continue to tithe regardless of the court's decision. The *Navarro* court distinguished the case from one in which tithing was a relatively recent decision of the debtors for the purpose of favoring religious beliefs over creditors. In *Bien*, the court similarly relied on the debtor's consistent practice of tithing; the debtor had been a full tithe-paying member for five and one-half years. Therefore, when applying the statutory analysis, the case law would support a conclusion that a tithe may be considered reasonable and necessary if the evidence shows tithing has been a consistent practice of the debtor or if the church requires tithing

as a condition for receiving full membership privileges.

A constitutional analysis has also been employed in addressing the tithing issue. In the case of *In re Green,* 73 B.R. 893 (Bankr. W.D.Mich.1987) *aff'd,* 103 B.R. 852 (W.D.Mich.1988), the debtor's budget included a payment of 10% of her gross monthly income to her church. The debtor testified that "her church and her own religious beliefs requires her to tithe." *Id.* at 893. The creditor did not contest the sincerity of the debtor's belief.

The court analogized the facts of *Green* to the U.S. Supreme Court decision in *Hobbie v. Unemployment Appeals Commission of Florida,* 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987). In *Hobbie,* an employer discharged an employee who had recently converted to become a Seventh Day Adventist and thus, could no longer work Friday nights or Saturdays. After the employee's termination, the state refused to grant her unemployment compensation benefits. The Supreme Court found that the state's denial of benefits violated the employee's right to the free exercise of religion because the state required her:

> to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work on the other. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against [her] for her Saturday worship.

*Hobbie,* 480 U.S. at 140, 107 S.Ct. at 1048 (*quoting, Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963)). The *Hobbie* court also held that:

> Where the state conditions a receipt of an important benefit upon conduct proscribed by a religious faith, or where it denied such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify

---

10. The creditor also objected to the allocation of money for the parochial school tuition of a child. This order does not analyze the appropriateness of parochial school tuition, as it is not pertinent to the case at bar.

11. With respect to the allowable amount of the religious contribution the court refused to hold that a tithe (10% by definition) was excessive.

his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

*Hobbie,* 480 U.S. at 141, 107 S.Ct. at 1049 (emphasis added in *Hobbie* ) (*quoting Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 717–18, 101 S.Ct. 1425, 1431–32, 67 L.Ed.2d 624 (1981)).

The *Green* court reasoned that Chapter 13 relief is at least as important as unemployment benefits. The court held that "[t]o deny confirmation of this plan solely because Mrs. Green tithes would be to deny her the benefits of the Bankruptcy Code because of conduct mandated by her religious beliefs." *In re Green,* 73 B.R. at 896. The court concluded that in the absence of a compelling state interest, it must confirm the plan.

The court in *In re McDaniel,* 126 B.R. 782 (Bankr.D.Minn.1991), also applied a constitutional analysis to a tithing issue. The issue in *In re McDaniel* was not whether the court would allow the debtor to tithe, but whether the proposed plan contained an excessive contribution to his church. While the debtor proposed to pay $540 per month to his church, the proposed monthly Chapter 13 plan payment was $600. The court rested its analysis upon the assumption that a *per se* ban on tithing would violate the First Amendment of the Constitution. The court reasoned, however, that a determination that the contribution was excessive would not violate the constitution.

In its analysis, the court emphasized that the contributions must be made in good faith and not in an effort to divert funds from creditors. The debtors met this requirement with evidence that they had tithed for several years prior to the filing of their petition. The court also noted the debtors' testimony that they "felt a strong moral obligation to continue" tithing but "would not be denied full participation in their church if they did not tithe." *Id.* 784 n. 2.

The court held that the debtors' proposed contribution was excessive primarily because the tithe nearly equaled the amount the debtors proposed to pay under their Chapter 13

plan. The court ordered that the debtors resubmit a plan with a smaller contribution provision. *Accord, In re Cadogan* 4 B.R. 598 (Bankr.W.D.La.1980) (court found combination of tithe and dues excessive).

Not all courts agree that a refusal to allow tithing would violate the constitution. In the case of *In re Navarro,* the court, in *dicta,* criticized the *Green* decision. The *Navarro* court opined that *Green* had improperly analogized denial of unemployment benefits to a court's decision to confirm a plan. The court reasoned that in Chapter 13 confirmation hearings, the role of the court is "not to award or deny substantive governmental benefits, but rather to balance the interest of various private parties according to neutral principals (sic) emanating from Congress." *Navarro,* 83 B.R. at 352. Essentially the court held that it was acting merely as an "instrument of pressure on the debtors … to allow creditors to exercise their rights." *Id.* at 352. More importantly, the court held that the administration of the bankruptcy system and the protection of creditors are sufficiently compelling interests to outweigh the free exercise of religion.

In a recent case, a District Court questioned the constitutional underpinnings of the *Green* decision in light of a 1990 Supreme Court opinion on the free exercise clause. In the case of *In re Young,* 152 B.R. 939 (D.Minn.1993), the debtors contributed a total of $13,450 to their church before filing a chapter 7 petition. The trustee filed an adversary proceeding which alleged that the contributions constituted fraudulent transfers pursuant to § 548 of the Bankruptcy Code. After concluding that the contributions met the requirements of a fraudulent transfer, the court examined the church's argument that the application of § 548 violated the *free exercise rights* of the debtors.

In its analysis, the *Young* court looked to the recent Supreme Court decision of *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In *Smith,* the state denied unemployment benefits to two Native Americans who had been discharged from their job at a drug rehabili-

tation organization after their employer discovered that they had ingested peyote, an illegal drug, as part of a religious ceremony.[12] *Smith,* 494 U.S. at 874, 110 S.Ct. at 1597. The Supreme Court upheld the denial of benefits and re-examined the constitutional rule to be applied in similar free exercise cases.

Justice Scalia delivered the majority opinion of the court in *Smith.* In his analysis, Justice Scalia interpreted the text of the free exercise clause, in the context of a tax law, to say "that if prohibiting the exercise of religion (or burdening the activity of printing) is not the object of the tax but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended." *Id.* at 878, 110 S.Ct. at 1599. Justice Scalia continued, "Our decisions have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Id.* at 878–79, 110 S.Ct. at 1599–1600. Justice Scalia also stated the Court's decisions "have consistently held that the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Id.* at 879, 110 S.Ct. at 1600 (quoting *United States v. Lee,* 455 U.S. 252, 263, n. 3, 102 S.Ct. 1051, 1058, n. 3, 71 L.Ed.2d 127 (1982) (Stevens, J., concurring in judgment)).

In the second part of his opinion, Justice Scalia sharply criticized the rationale of *Sherbert v. Verner, Thomas v. Review Board, Indiana Employment Division,* and *Hobbie v. Unemployment Appeals Commission of Florida* and limited them to their facts. Justice Scalia observed that the Supreme Court has "never invalidated any governmental action on the basis of the *Sherbert* test except the denial of unemployment compensation." *Id.* at 883. Additionally, Justice Scalia noted that in recent years the Court has abstained from using the test developed in *Sherbert* at all.[13] Justice Scalia suggested that a broad application of the *Sherbert* test would invalidate a plethora of laws, a result which the free exercise clause does not require.

The *Young* court acknowledged that on its facts the *Smith* decision applied only to the denial of benefits that resulted from the violation of a criminal statute. The *Young* court, however, concluded that the rationale of the *Smith* decision did not restrict its application to cases in which religious beliefs and criminal statutes collide. The *Smith* case was found to stand for the proposition that "an individual cannot escape a valid and neutral law of general applicability by merely asserting that the law violates his or her religious beliefs." *Young,* 152 B.R. at 951 (citing *Smith,* 494 U.S. at 878–80, 110 S.Ct. at 1599–1601).

In the absence of indications contained "in the statutory text or otherwise that section 548 was designed to regulate religious beliefs or conduct," the *Young* court concluded that "section 548 is a neutral law of general applicability." *Id.* at 953. Furthermore, the court held that § 548 had no more than an incidental effect on religion and noted that "[t]he purpose of the statute is to enlarge the pool of funds for creditors by recovering gratuitous transfers made on the eve of bankruptcy by insolvent debtors." *Id.* at 953. The court, therefore, dismissed the church's constitutional challenge to the application of § 548 to avoid the prepetition transfers to the church.[14]

---

12. The Oregon Supreme Court "held that respondents' religiously inspired use of peyote fell within the prohibition of the Oregon statute, which 'makes no exception for the sacramental use' of the drug." *Smith,* 494 U.S. at 876, 110 S.Ct. at 1598.

13. In a post-*Smith* decision, the Supreme Court adopted the *Smith* analysis. *Church of the Lukumi Babalu Aye, Inc. v. Hialeah,* —— U.S. ——, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). Justice Kennedy wrote that "[i]n addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* at ——, 113 S.Ct. at 2226.

14. The *Young* court also dismissed the church's argument that because other courts have allowed tithing in chapter 13 cases, the debtor's contributions to the church should be exempt from § 548. The court distinguished the chapter 13 cases on the basis that the relevant statutory

■ The Supreme Court's opinion in *Smith*, therefore, appears to have modified the constitutional First Amendment analysis applicable in the instant case. As a result, a constitutional challenge to a determination that tithing is an unreasonable expense, subjecting a debtor to dismissal under § 707(b), is not sustainable. The free exercise clause does not require the Bankruptcy Code to yield to the debtors' desire to tithe. The Supreme Court's analysis in *Smith* provides that a court need not make an exception for a religious practice when the applicable statute is a valid and neutral law of general applicability. As the *Young* court concluded with respect to § 548, § 707(b) is also a neutral law of general applicability. Nothing suggests that § 707(b) was designed to regulate religious beliefs or conduct.

In those cases in which courts have found a constitutional right to tithe, the courts premised their decisions on a finding that the debtors had tithed consistently and that either the debtors' church required tithing or the debtors had a strong commitment to continue tithing. *In re Green*, 73 B.R. at 893; *In re McDaniel*, 126 B.R. at 784, n. 2. In the instant case, Debtors have not established a consistent practice of tithing. Neither have Debtors introduced credible evidence of strong commitment to tithe. Debtors failed to tithe in times of financial difficulty. Additionally, they have been church members since June 1992, but have contributed only since January 1993. Finally, Debtors did not provide for tithing in their original schedules.

■ Absent the constitutional challenge, the issue must focus on the statute itself, § 707(b): Whether Debtors' tithing is an excessive or unreasonable expense. As noted above, cases pertaining to § 1325 are persuasive. In both *Bien* and *Navarro*, the courts allowed tithing under § 1325. In both of those cases, however, the court found that the debtor had established a consistent practice of tithing. In the instant case, Debtors have not tithed consistently. Debtors admit they have chosen to forego tithing in the past

because of financial difficulties. These financial difficulties apparently persist, yet Debtors ask this court to affirm the most recent decision to tithe at the expense of their creditors.

Relying on *Bien*, Debtor argues that he will no longer be able to serve as a deacon if the bankruptcy court prohibits him from tithing. *Bien*, however, is distinguishable from the instant case. The debtor in *Bien* tithed on a consistent basis before filing bankruptcy and declared that she would continue to tithe regardless of the court's decision. Furthermore, the debtor in *Bien* presented clear evidence that she would lose certain privileges within the church if she failed to tithe. In the instant case, Debtors admit they have not tithed consistently and have not asserted that the church requires tithing for full membership privileges. In fact, Debtors' affidavits show that although they have been members of the church since June 1992, they have contributed to their church only since January 1993. Additionally, Debtors did not provide for tithing in their original schedules. The affidavits submitted by the debtors are vague and self-serving on the issue of whether "stewardship responsibilities" require tithing. Debtor Martin Lee declares that his obligation to tithe does not arise from his duties as a Deacon. Because debtors have not tithed consistently and because their church does not require tithing as a condition for full membership privileges, the monthly expense for tithing is unreasonable.

■ As Debtors' list of monthly expenses is excessive by $350, Debtors' monthly disposable income should be increased to reflect that amount. A disposable income in the amount of $227 plus $350, or $577, would enable Debtors to pay their unsecured creditors 100% of their claims in less than 36 months. Therefore, Debtors have the ability to repay a substantial portion of their unsecured debt in a Chapter 13 plan.

Debtors recite that between November 1990 and July 1991, Debtors made ten automobile trips between Arkansas and North

Carolina to attend to Mr. Lee's ailing father. Debtors contributed to payment of his father's funeral expenses in July 1991. (Debtors did not disclose the amount of this contribution.) In June 1992, Debtor Martin Lee was transferred from Arkansas to Atlanta and Debtors incurred expenses in connection with the move and with the inability to sell the house in Arkansas. Debtors allege that at the time they filed their bankruptcy petition, they were three months' delinquent in mortgage payments on the house in Arkansas.[15]

The expenses related to Debtor's father's illness and death in 1990 and 1991 appear too remote to constitute a calamity which precipitate the filing of the bankruptcy in December 1992. The recent move may have put a financial strain upon Debtors, and it appears likely that imminent foreclosure on the house in Arkansas may have precipitated the filing of this bankruptcy case. The expenses incurred in connection with the move to Atlanta, however, do not appear so large as to constitute a calamity and it is possible that any expenses associated with the delay in selling the Arkansas property will be cured when the residence is sold.

Debtors' amendment of the schedules when faced with the U.S. Trustee's motion to dismiss also renders their veracity suspect. For example, Debtors apparently did not even decide to begin tithing until after their bankruptcy petition was filed. It can be inferred that, when Debtors realized the extent of their postpetition positive cash flow, they found ways to spend it. This court does not dispute Debtors' commitment to their church or their honest desire to tithe. This court also does not deny Debtors their right to tithe. Debtors may choose to adjust their budget elsewhere and continue to tithe. It is inequitable to allow Debtors to tithe at the expense of their creditors, when, in the past, Debtors have been able to adjust their moral commitment to tithing to allow for their other financial commitments.

An evaluation of the totality of circumstances shows Debtors have an ability to pay a substantial portion of their unsecured debt within a reasonable time. No calamity has befallen them to precipitate the filing of this petition. Debtors' revised list of monthly living expenses appears generous to the point of being excessive, especially when compared to the initial budget filed with the petition. Debtors' revised budget was filed only after the U.S. Trustee filed his motion to dismiss and, therefore, the significant upward revisions to Debtors' expenses appear self-serving and questionable.

Nevertheless, even allowing the revised budget, including the amount for tithing, as reasonable, $227 of disposable income would allow Debtors to repay approximately half of their unsecured debt over 36 months and approximately 80% of their unsecured debt over 60 months. Therefore, the totality of the circumstances shows that allowing Debtors to proceed with a no-asset Chapter 7 case would constitute a substantial abuse of the bankruptcy process. Accordingly, it is hereby

ORDERED that Debtors' case is dismissed pursuant to 11 U.S.C. § 707(b).

IT IS SO ORDERED.

---

15. Any action on that obligation would have been stayed by the automatic stay of 11 U.S.C. § 362(a). Debtors do not disclose whether any progress has been made towards selling that property.